Carol NOVAK and Robert Nieman, on
behalf of themselves and all others
similarly situated, Plaintiffs,

v.

Sally Frame KASAKS, Paul E. Francis,
Joseph R. Gromek, Gerald S. Armstrong,
James J. Burke, Jr., Merrill Lynch &
Co., Merrill Lynch, Pierce, Fenner &
Smith Incorporated, Merrill Lynch Capi-
tal Partners, Inc., ML IBK Positions,
Inc., Merchant Banking L.P. No. III,
Kecalp, Inc., AnnTaylor Stores Corpora-
tion and AnnTaylor, Inc., Defendants.

No. 96 Civ. 3073(AGS).

United States District Court,
S.D. New York.

March 10, 1998.

Milberg Weiss Bershad Hynes & Lerach LLP, New York City, Finkelstein & Associates, San Diego, CA, Rossbacher & Associates, Los Angeles, CA, Abbey & Ellis, New York City, for Carol Novak and Robert Nieman.

Skadden, Arps, Slate, Meagher & Flom, New York City, for AnnTaylor Stores Corp., AnnTaylor, Inc., Sally Frame Kasaks, Paul E. Francis and Joseph R. Gromek.

Rogers & Wells, New York City, for Merrill Lynch & Co. and Merrill Lynch, Pierce, Fenner & Smith Inc.

Wachtell, Lipton, Rosen & Katz, New York City, for Gerald S. Armstrong, James J. Burke, Jr., Merrill Lynch Capital Partners, Inc., ML IBK Positions, Inc., Merchant Banking L.P. No. III and KECALP, Inc.

## OPINION AND ORDER

SCHWARTZ, District Judge.

In this action, based upon alleged securities fraud, defendants move to dismiss the complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure (failure to state a claim) and Section 21D(b)(3) of the Securities Exchange Act of 1934 (failure to plead fraud with particularity and an inability to do so). For the reasons set forth below, defendants' motions to dismiss are granted.

## BACKGROUND [1]

### 1. The Parties

Plaintiff Carol Novak purchased twenty-five shares of AnnTaylor stock on November 30, 1994, and plaintiff Robert Nieman purchased three hundred shares of AnnTaylor stock on April 16, 1995. (Compl.¶ 31.) The named plaintiffs purport to represent a class of persons who bought AnnTaylor stock during the asserted class period of February 3, 1994 through May 4, 1995 (the "Class Period"). (Compl.¶ 1.)

Defendant AnnTaylor Stores Corporation, through its wholly-owned subsidiary AnnTaylor, Inc. (collectively, "AnnTaylor"), is a specialty retailer of women's apparel, shoes, and accessories. (Compl.¶ 32(a).) Defendant Sally Frame Kasaks is the Chief Executive Officer and Chairman of the Board of AnnTaylor. (Compl.¶ 33(a).) Defendant Paul E. Francis is Executive Vice President for Finance and Administration, Chief Financial Officer, and a director of AnnTaylor. (Compl.¶ 33(b).) Defendant Joseph R. Gromek was a Senior Vice President and General Merchandise Manager of AnnTaylor from April 1993 through April 1995.[2] (Compl.¶ 33(c).) We shall refer to these defendants collectively as the "AnnTaylor defendants."

Defendant Merrill Lynch & Co. is a holding company which operates, in part, through its subsidiaries defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated and defendant Merrill Lynch Capital Partners, Inc. (Compl.¶ 34(a).) The latter entity, in turn, is the general partner in three limited partnerships (not defendants in this action) which sold 3.8 million shares during the Class Period. (Compl.¶ 34(c).) "Merrill

---

**1.** The relevant undisputed facts discussed herein are drawn from the allegations of the complaint or otherwise reflected in the record, including the affidavits and exhibits submitted by the parties.

**2.** The Court notes that the complaint is particularly deficient in specific allegations of culpable behavior on the part of defendant Gromek, stating nothing more than that Gromek was one of three people who gave "key information" to a certain securities analyst (Compl.¶ 92), and that he was one of numerous presenters at an annual AnnTaylor investor conference (Compl.¶ 95).

Lynch"[3] controls and held AnnTaylor stock through defendants ML IBK Positions, Inc., Merchant Banking L.P. No. III, and KE-CALP, Inc. (Compl.¶ 34(b).) Defendants Gerald S. Armstrong and James J. Burke, Jr. are directors of AnnTaylor, partners in Merrill Lynch Capital Partners, and former managing directors of the Investment Banking Division of Merrill Lynch & Co. (Compl.¶¶ 33(d)(i) and 33(e)(i).) We shall refer to the parties enumerated in this paragraph collectively as the "Merrill Lynch defendants."[4]

### 2. *The Allegations*

Simply put, plaintiffs allege that the Ann-Taylor defendants artificially inflated the price of AnnTaylor stock by hiding excess inventory and failing to take write-downs at the proper times. Plaintiffs maintain that all defendants had actual or constructive knowledge that the company had serious inventory problems which were inconsistent with optimistic representations contained in public statements issued on AnnTaylor's behalf during the Class Period. Plaintiffs further contend that defendants refrained from disclosing this adverse information to the public until May 1995, and that these misrepresentations and omissions render defendants liable for securities fraud.

More specifically, plaintiffs make the following allegations:

· On February 3, February 14, and February 28, 1994, defendants Kasaks and Francis told securities analysts that inventories were in good shape and under control. (Compl.¶¶ 47—49.)

· In early 1994, "Merrill Lynch and Ann-Taylor" did a national "roadshow" during which "AnnTaylor executives" said that inventories were under control and within expected levels. (Compl.¶ 56.)

· On June 1, 1994, defendants Kasaks and Francis told securities analysts that inventories were at very reasonable levels. (Compl.¶ 62.)

· On June 13, 1994, AnnTaylor filed its Form 10–Q for the quarter ending April 30, 1994, signed by defendant Francis, with the Securities and Exchange Commission ("SEC"). This form attributed higher inventory levels to expansion. (Compl.¶ 63.)

· On July 7, 1994, "AnnTaylor insiders" told securities analysts that inventory levels were in good shape. (Compl.¶ 64.)

· On August 4, 1994, defendants Kasaks and Francis told securities analysts that inventories were in great shape. (Compl.¶ 65.)

· On September 1, 1994, defendants Kasaks and Francis told securities analysts that inventories were light. (Compl.¶ 68.)

· On September 12, 1994, AnnTaylor filed its Form 10–Q for the quarter ending July 30, 1994, signed by defendant Francis, with the SEC. This form attributed higher inventory levels to expansion. (Compl.¶ 71.)

· In mid-September 1994, defendants Kasaks and Francis told securities analysts that inventories were under control. (Compl.¶ 74.)

· On November 8, 1994, defendants Kasaks and Francis told securities analysts that inventories were up 64%, but that this was due to accelerating growth. (Compl.¶ 81.)

· On December 9, 1994, AnnTaylor filed its Form 10–Q for the quarter ending October 29, 1994, signed by defendant Francis, with the SEC. This form attributed higher inventory levels to expansion. (Compl.¶ 87.)

**3.** In paragraph 34(d) of the Complaint, plaintiffs state that "[u]nless the context requires otherwise, "Merrill Lynch" means all … Merrill Lynch entities." This lack of specificity in pleading not only renders this recitation of the facts less informative than it might otherwise have been, but also violates the rule that "[w]here multiple defendants are asked to respond to allegations of fraud, the complaint should inform each defendant of the nature of his alleged participation in the fraud." *DiVittorio v. Equidyne Extractive Indus., Inc.,* 822 F.2d 1242, 1247 (2d Cir.1987).

**4.** We denominate the defendants in this manner for the sake of semantic coherence. This in no way implies that global references in the complaint to "Merrill Lynch" are sufficiently detailed so as to withstand a motion to dismiss.

· On January 3, 1995, defendants Kasaks and Francis told securities analysts that no major or unusual markdowns were anticipated. (Compl.¶ 91.)

· On February 21, 1995, defendants Kasaks and Francis told securities analysts that inventories were up 22%, but that this was in line with planned sales. (Compl.¶ 94.)

· On April 19, 1995, "AnnTaylor" told securities analysts that inventories would be in good shape at the end of April. (Compl.¶ 103.)

· In early May 1995, AnnTaylor announced that same store sales were down, that new stores were performing well below expectations, that its inventories were too high, and that inventory liquidation would result in fiscal 1995 earnings much lower than previously forecast. (Compl.¶ 107.)

Plaintiffs allege that this series of unwaveringly favorable statements followed by an unexpected announcement of financial difficulties caused the price of AnnTaylor stock to rise to an artificially high level and then plummet. Specifically, the stock climbed from $20 1/2 per share in January 1994 to a high of $44 7/8 in November 1994. (Compl.¶ 1.) Shares traded in the $37 range until April 1995, but had lost 50% of their value by early May, dropping to $18 3/8. This included a one-day plunge of 25% on May 3–4, coinciding with one of the negative announcements. (Compl.¶ 107.) By October 1995, the share price had declined to $15, and thereafter fell to a low of $9. (Compl.¶ 18.)

Plaintiffs further allege that throughout the Class Period, the AnnTaylor defendants were participating in a "box-and-hold" scheme in which excess inventory was hidden in warehouses and not written down according to Generally Accepted Accounting Principles ("GAAP"). (Comp.¶ 117–118.) Had AnnTaylor timely taken these write-downs, plaintiffs contend, the company would have shown a net loss for the fiscal year ending January 29, 1994 (rather than the $3 .2 million net income reported), and net income of approximately $10 million less than the $31.7 million reported for the year ending January 28, 1995. (Compl.¶¶ 119, 123.) By hiding inventory and delaying in taking write-

downs, the AnnTaylor defendants presumably first caused stock prices to rise to inflated levels by misleading the public as to the company's financial health, and then caused prices to plummet by revealing the true state of affairs.

Plaintiffs allege that among the factors motivating the AnnTaylor defendants to forestall disclosure of the company's true inventory situation was a desire to inflate the share price in advance of a May 1994 secondary stock offering. (Compl.¶ 6.) In this offering, "Merrill Lynch" sold off 4 million shares of AnnTaylor stock which it had been holding since the initial public offering in May 1991. (Compl.¶¶ 2, 6.) The secondary offering also permitted AnnTaylor to sell one million new shares, allowing it to reduce its debt levels. (Compl.¶ 6.) Plaintiffs further allege that AnnTaylor was motivated to keep the share price high after the offering so that Merrill Lynch could unload even more shares, which it did during late November and early December 1994, selling 781,000 additional shares. (Compl.¶¶ 9, 13.)

As we have noted, plaintiffs purchased shares of AnnTaylor common stock in the period between February 3, 1994 and May 4, 1995, during which time the AnnTaylor defendants allegedly hid the fact that unsalable inventory was accumulating and that earnings were therefore overstated. Plaintiffs advance a "fraud on the market" theory of reliance and causation, alleging that they purchased AnnTaylor stock at artificially inflated prices and suffered damage as a result of the AnnTaylor defendants' material misrepresentations and omissions. Plaintiffs assert claims for relief against all defendants under Section 10(b) of the Securities Exchange Act of 1934 ("the 1934 Act"), 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder, 17 C.F.R. 240.10b–5, and against defendants Kasaks, Burke, Armstrong, AnnTaylor and "Merrill Lynch" under Section 20 of the 1934 Act, 15 U.S.C. § 78t.

## DISCUSSION

It is by now well recognized that securities class actions such as this one present an "inevitable tension between two powerful in-

terests." *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 263 (2d Cir.1993). On the one hand, there is the interest in deterring fraud in the securities market and remedying it when it occurs. As Chief Judge Newman noted in *Time Warner:*

> That interest [in deterring fraud] is served by recognizing that the victims of fraud often are unable to detail their allegations until they have some opportunity to conduct discovery of those reasonably suspected of having perpetrated a fraud. Consistent with that interest, modern pleading rules usually permit a complaint to survive dismissal unless ... "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *See Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957).

*Id.* On the other hand, there is society's interest in "deterring the use of the litigation process as a device for extracting undeserved settlements as the price of avoiding the extensive discovery costs that frequently ensue once a complaint survives dismissal, even though no recovery would occur if the suit were litigated to completion." *Id.* As Chief Judge Newman noted, the resolution of these two competing interests is often difficult in the absence of a more refined statutory standard than the vague contours of Section 10(b) or a more detailed attempt at rulemaking than Rule 10b–5.

This case presents a textbook example of the tension between these two competing interests. After much deliberation, and in light of recent guidance from Congress in the Private Securities Litigation Reform Act of 1995 ("PSLRA"), the Court has concluded that the complaint must be dismissed because it fails to allege facts giving rise to a strong inference of fraudulent intent.

## A. *Sufficiency of Scienter Allegations*

To state a cause of action for securities fraud under Section 10(b) of the 1934 Act and Rule 10b–5, a plaintiff must plead that the defendant made a false statement or omitted a material fact, with scienter, and that plaintiff's reliance on defendant's action caused plaintiff injury. *San Leandro Emergency*

*Med. Group v. Philip Morris Cos.,* 75 F.3d 801, 808 (2d Cir.1996) (citations omitted).

Rule 9(b) of the Federal Rules of Civil Procedure provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge and other condition of mind of a person may be averred generally." An essential purpose of Rule 9(b) is to prevent plaintiffs from using "conclusory generalizations ... to set off on a long and expensive discovery process in the hope of uncovering some sort of wrongdoing or of obtaining a substantial settlement." *Decker v. Massey–Ferguson, Ltd.,* 681 F.2d 111, 116 (2d Cir.1982); *see also DiVittorio v. Equidyne Extractive Indus., Inc.,* 822 F.2d 1242, 1247 (2d Cir.1987) ("Rule 9(b) is designed to further three goals: (1) providing a defendant fair notice of plaintiff's claim, to enable preparation of defense; (2) protecting a defendant from harm to his reputation or goodwill; and (3) reducing the number of strike suits."). However, Rule 9(b) does not abrogate the general rule that "pleadings are to be construed in a light most favorable to the pleader and accepted as true [and should not be dismissed] unless it appears that plaintiff can prove no set of facts that would entitle him to relief." *Ross v. Bolton,* 904 F.2d 819, 823 (2d Cir.1990).

*San Leandro* is representative of cases in this Circuit in which courts have carefully scrutinized securities fraud complaints with regard to the sufficiency of allegations of scienter. Courts in this Circuit have not been hesitant to dismiss securities fraud complaints on findings of insufficient allegations of fraudulent intent. *See San Leandro,* 75 F.3d at 812–814; *Acito v. IMCERA Group, Inc.,* 47 F.3d 47, 53–54 (2d Cir.1995); *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1127–28 (2d Cir.1994); *Connecticut Nat'l Bank v. Fluor Corp.,* 808 F.2d 957, 962 (2d Cir.1987).

Furthermore, under the PSLRA, a complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). Prior to the enactment of the PSLRA, the rule in

regard to scienter in this circuit was that a "strong inference" might be established by showing either motive and opportunity to commit fraud or circumstantial evidence of either reckless or conscious behavior. *See, e.g., Time Warner,* 9 F.3d at 269. There has been much debate in the federal courts as to whether the PSLRA adopted or strengthened this Second Circuit standard.

The growing trend in the courts, and particularly in this district, is to find that Congress intended to strengthen the Second Circuit standard. The two leading Southern District cases, *Norwood Venture Corp. v. Converse, Inc.,* 959 F.Supp. 205 (S.D.N.Y. 1997) and *In re Baesa Securities Litigation,* 969 F.Supp. 238 (S.D.N.Y.1997), both held that the pleading of motive and opportunity no longer suffices to raise a strong inference of scienter. *See Baesa,* 969 F.Supp. at 242; *Norwood,* 959 F.Supp. at 208.

In reaching this conclusion, Judge Rakoff relied upon what he considered to be the "clear language" of the PSLRA. In the court's view, had Congress wished to adopt the "motive and opportunity" prong of the Second Circuit standard, it would have said so. *Baesa,* 969 F.Supp. at 242. Judge Baer, on the other hand, based his decision on the legislative history of the PSLRA. He relied particularly upon statements in a House Conference Report that Congress intended to "strengthen existing requirements" and did not "intend to codify the Second Circuit's case law," and upon the President's veto message (a veto which Congress overrode) stating that it was "crystal clear" that Congress intended the PSLRA to go beyond the Second Circuit standard. *Norwood,* 959 F.Supp. at 208. Without expressing a view as to the superiority of either rationale, the Court adopts the view that evidence of motive and opportunity no longer suffices to plead scienter.[5]

The courts have also been divided as to whether recklessness is a sufficient state of mind under the PSLRA, as it was in virtually every circuit prior to the enactment of the law, or if conscious intent to defraud is now required. Judge Rakoff, in *Baesa,* found that Congress expressed no clear intention in the PSLRA to eliminate the recklessness prong of the scienter requirement. *See Baesa,* 969 F.Supp. at 241. Judge Baer, on the other hand, again relying on the legislative history of the PSLRA, implied in *Norwood* that Congress intended to eliminate recklessness along with the motive and opportunity prong. *See Norwood,* 959 F.Supp. at 208. However, in *In re Glenayre Technologies, Inc. Securities Litigation,* 982 F.Supp. 294, 298 (S.D.N.Y.1997), Judge Baer clarified that conscious recklessness—approximating actual intent, and not merely a heightened form of negligence—would suffice. We join the emerging consensus in this district that either conscious recklessness or actual intent satisfy the PSLRA's scienter requirement.

In the Court's view, the fatal defect in the complaint lies in its allegations of scienter. Specifically, the Court finds that the complaint must be dismissed because it fails to plead facts giving rise to a strong infer-

---

5. Although not necessary to our decision, we note that plaintiffs have not satisfied even the motive and opportunity prong. Plaintiffs attribute three motives to the AnnTaylor defendants for making allegedly fraudulent favorable statements about the company: to conceal their mismanagement and to enhance their compensation and prestige (Compl.¶ 39), to enhance the value of their holdings and options (*id.*), and to raise capital (Compl.¶ 5). These allegations of motive are insufficient as a matter of law. *See Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1130 (2d Cir.1994) (motive must be more than an aim to prolong the benefits of one's executive position or to continue employment); *Acito v. IMCERA Group, Inc.,* 47 F.3d 47, 54 (2d Cir.1995) ("[T]he existence, without more, of executive compensation dependent upon stock value does not give rise to a strong inference of scienter."); *Shields,* 25 F.3d at 1131 (stock ownership alone is not enough; shares must be *sold* at an inflated price); *Glickman v. Alexander & Alexander Servs., Inc.,* No. 93–Civ–7594, 1996 WL 88570, at *7 (S.D.N.Y. Feb.29, 1996) (vague allegations of motive like "raising desperately needed capital" are too generalized to satisfy the scienter requirement). Plaintiffs' allegation as to the motive of the Merrill Lynch defendants, i.e., to sell off the shares which they were holding (Compl.¶ 6), is equally unavailing. To constitute motive, stock sales must be "unusual." *See Acito,* 47 F.3d at 54. In the instant case, the Merrill Lynch defendants held their stock for approximately five years, and then sold off less than one-half their holdings. (Compl.¶¶ 2, 6, 1(a).) Plaintiffs make no allegation as to why this sort of activity by entities engaged in the investment banking industry is "unusual."

ence of fraudulent intent, i.e., that defendants' conduct was conscious or reckless. Put in the simplest terms, the complaint fails to allege with sufficient specificity that at the time the AnnTaylor defendants made favorable statements to securities analysts, they were aware that much of their inventory was worthless or seriously overvalued, or were reckless as to whether that was the case.

This deficiency is particularly striking where the target of the allegations is conceded to be "a specialty retailer of women's apparel, shoes, and accessories;" a company engaged in a business that is affected by considerations of fashion and taste. In effect, AnnTaylor was necessarily involved in the generation of inventory based upon predictions as to product that was expected to sell at a particular time or season. Investors acquiring shares in such an entity knew or had reason to know that depending upon fashion or marketing considerations, there would necessarily be inventory fluctuations. The term "box-and-hold" is nowhere defined in the complaint; nor is any information provided as to the source or origin of such a term. The implication is that inventory was placed in containers and stored for some period of time or held for sale in later seasons. That action, even if it were a fact, is one essentially of business judgment. If there is more than business judgment involved, i.e., something wrongful, then plaintiffs were required under Rule 9(b) to set forth, in detail, the particulars of that wrongfulness. Plaintiffs have, instead, relied virtually exclusively on conclusory language (e.g., "inventories had *exploded to dangerously bloated levels*" (Compl.¶ 1(a))) and hot words (e.g., "plunged into a liquidity crisis" (*id.*)) in a 111 page complaint of 138 paragraphs.

Plaintiffs allege that, by virtue of their positions, all individual defendants had access to unspecified internal corporate documents containing adverse non-public information. (Compl.¶¶ 33(a)–(e)). Elsewhere in the complaint, plaintiffs seem to focus on three types of documents. First, plaintiffs maintain that defendants had annual budget projections and "negative internal reports" showing that these projections were not being met and that inventory was accumulating. (Compl.

¶ 40.) Second, plaintiffs claim that defendants Kasaks and Francis received weekly recaps of new store performance which revealed "serious and persistent problems with those new stores." (Compl.¶ 41.) Finally, plaintiffs claim that Kasaks and Francis also received merchandise reports "reporting weakness in sales and mounting excess inventory." (*Id.*)

As we have noted previously, Fed.R.Civ.P. 9(b) requires that claims of fraud be pled with particularity. Beyond this, the PSLRA requires that a complaint state "with particularity all facts" upon which allegations made upon information and belief are based. 15 U.S.C. § 78u–4(b)(1). The complaint in the instant action is woefully devoid of any such particularity. Plaintiffs acknowledge this pleading requirement in only a single paragraph:

> Plaintiffs have alleged the foregoing based upon the investigation of their counsel, which included a review of AnnTaylor's SEC filings, securities analysts reports and advisories about the Company, press releases issued by the Company, media reports about the Company and discussions with consultants, and believe that substantial evidentiary support will exist for the allegations set forth....

(Compl. ¶ 138, entitled "Basis of Allegations.")

This paragraph provides none of the required facts underlying the complaint's allegations as to the information that was available to the individual defendants, nor does it direct the Court to where those facts might be found. In fact, of the possible sources listed in the paragraph, only the "consultants" could have provided plaintiffs with specifics of internal reports. If, in fact, these unnamed "consultants" provided information forming the basis for these allegations, then the consultants should have been named in the complaint.

An identical paragraph was rejected as insufficiently specific in *In re Silicon Graphics, Inc. Sec. Litig.*, 970 F.Supp. 746 (N.D.Cal.1997). Citing to the legislative history of the PSLRA, and more specifically to an amendment rejected by Congress which would have permitted plaintiffs to plead sim-

ply facts which support their belief, the court concluded that a plaintiff might well have to provide the names of "confidential informants, employees, competitors, Government employees, members of the media, and others who have provided information leading to the filing of the case." *Id.* at 763.

Plaintiffs also provide no basis for their allegation that "[t]hroughout the Class Period, AnnTaylor was falsifying and artificially inflating its reported net income and earnings per share via its "box-and-hold" scheme to hide excess, slow-moving and/or unsalable inventory and avoid writing off that inventory." (Compl. ¶ 70(a).) Defendants allegedly moved "millions of dollars of excess and obsolete inventory from its main stores . . . to two warehouses . . . , so that AnnTaylor could avoid or delay the adverse financial statement impact of such excessive inventories." (Compl.¶ 70(j).)

At oral argument before this Court on November 17, 1997, plaintiffs maintained that they had conducted a one-year investigation into this alleged scheme, and that in the course of this investigation, they had spoken to former employees of AnnTaylor. They also maintained that written documentation of the scheme exists, and that AnnTaylor documents actually use the phrase "box-and-hold." (Tr. at 58–59.) If plaintiffs do, in fact, have this sort of information available to them, then it should have been included in the complaint. Oral, unsworn representations made by counsel cannot substitute for formal pleadings or affidavits. *See San Leandro Emergency Med. Group v. Philip Morris Cos.*, 75 F.3d 801, 808 (2d Cir.1996) (stating that plaintiffs' unsupported claim of the existence of confidential company reports is insufficient to survive a motion to dismiss, and citing with approval cases from the First

and Seventh Circuits requiring that plaintiffs provide specifics as to internal reports).

The Court rejects as inconsistent with the pleading requirements of the PSLRA plaintiffs' allegations regarding a "box-and-hold" scheme. We note briefly that counsel for the AnnTaylor defendants stated at oral argument that AnnTaylor does, in fact, transfer merchandise to warehouses on a seasonal basis, that some of this merchandise is ultimately sold at less than full price, and that the value of this inventory is written down on the books as markdowns are taken. (Tr. at 23–27.) Plaintiffs allege that by January 29, 1994, AnnTaylor had hidden approximately $6 million in inventory and failed to take corresponding write-offs of $3.25 million, and that by January 28, 1995, approximately $25 million worth of inventory was hidden, requiring write downs in excess of approximately $10 million. (Compl.¶¶ 109, 119, 123.) Because plaintiffs offer no facts upon which they base their allegations, they are improperly pled.[6]

More to the point, however, is the import to be accorded plaintiffs' data, even were we to accept them. AnnTaylor acknowledges holding merchandise in warehouses and ultimately marking down this merchandise. Plaintiffs, without specifying precisely when or under what circumstances markdowns should have been made, apparently fault the timing of the markdowns that were made.[7] But disagreement with a company's business judgment does not state a claim under federal securities laws. *See In re Software Toolworks, Inc. Sec. Litig.*, 789 F.Supp. 1489, 1504 (N.D.Cal.1992) ("[W]hether the inventory should have been written down was a matter of judgment on which Plaintiffs disagree, not a basis on which to infer scienter."), *aff'd in part, rev'd in part on other grounds*, 50 F.3d 615 (9th Cir.1994). To hold

---

**6.** On this motion to dismiss, the Court does not, of course, gauge the credibility of plaintiffs' allegations in regard to a "box-and-hold" scheme. We note, however, that defendant Francis, the Chief Financial Officer of AnnTaylor, who is alleged to have been "hand-picked for his job with AnnTaylor by Merrill Lynch so that Merrill Lynch would be able to manipulate AnnTaylor's financial results" (Compl.¶ 33(b)), *bought* 16,000 shares of AnnTaylor stock, at prices ranging from $31.675 to $41.625, during the period when it is

alleged that the Merrill Lynch defendants benefited from his wrongful conduct by *selling* portions of the shares held by them.

**7.** Plaintiffs also attribute ulterior motives to the timing of the markdowns. Plaintiffs' failure to point to a factual source for their allegations leads the Court to regard such allegations as mere surmise.

otherwise, absent specific factual information as required by Rule 9(b), would be to expose every inventory judgment of a reporting company to the potential burden of litigation.

In sum, the Court finds that plaintiffs have properly pled nothing more than that the AnnTaylor defendants issued a series of positive statements about the financial health of the company, that certain securities analysts utilized these statements in forming an opinion about the prospects of the company, that opinions issued by these analysts led to a rise in the share price of AnnTaylor stock, and that this share price fell when AnnTaylor subsequently issued negative statements. The remainder of plaintiffs' allegations in regard to scienter are unsupported by any sort of factual background, and we must disregard them as speculation. *See In re 1993 Corning Sec. Litig.*, 1996 WL 257603, at *8 (S.D.N.Y. May 15, 1996) (dismissing complaint which "simply 'couple[d] a factual statement with a conclusory allegation of fraudulent intent.'") (quoting *Shields v. Citytrust Bancorp., Inc.*, 25 F.3d 1124, 1129 (2d Cir.1994)).

The Court's finding that the AnnTaylor defendants lacked the requisite scienter under the PSLRA is dispositive, not only of the claims against them, but also of the Section 10(b) and Rule 10b–5 claims against defendants Burke and Armstrong, and the corporate Merrill Lynch defendants. The complaint alleges nothing more than that Burke and Armstrong were outside directors of AnnTaylor,[8] and had access to the same documents as did the AnnTaylor defendants. When given the opportunity at oral argument to present to the Court particulars as to Armstrong's and Burke's actual knowledge at any given point in time, and as to whether Armstrong and Burke communicated this knowledge to the other Merrill Lynch defendants, counsel for plaintiffs was unable or unwilling to provide such detail.

8. Plaintiffs argue that Armstrong and Burke "were intimately involved in AnnTaylor day-to-day operations" (Mem. in Opp'n to Merrill Lynch Mot. to Dismiss at 19), and should therefore be treated not as outside directors, but rather as corporate insiders. *See Hallet v. Li & Fung, Ltd.*, 1996 WL 487952, No. 95–Civ.–8917, 1996 U.S. Dist. LEXIS 12513 at *9–12 (S.D.N.Y. Aug. 27, 1996) (stating that outside directors may be considered insiders when they have access to a certain class of information). This distinction is irrelevant to our analysis, and we decline to decide it. There is no allegation in the complaint that Armstrong and Burke had access to information not available to the AnnTaylor defendants, and so allegations of scienter on the part of Armstrong and Burke are also insufficiently pled.

THE COURT: They [Armstrong and Burke] specifically knew of this box-and-hold scheme? Are you alleging that?

MR. FLEISCHMAN: Your Honor, it is alleged that they had knowledge, yes, of everything internally that was going on, which would include the box-and-hold scheme.

THE COURT: By reference to what do you tell me that this is so? In other words, Rule 9(b) has certain parameters, and the Act certainly incorporates those parameters; that is, where, when, under what circumstances did they acquire this knowledge of a box-and-hold scheme, not that inventory was going up and down or that sales were going up and down in particular stores. How do you know this?

MR. FLEISCHMAN: Well, first of all, we don't have to know that for the pleading of a complaint. We don't have to say in the complaint that Armstrong and Burke sat in on a meeting where the box-and-hold was discussed. It is enough to say that they are insiders with material inside information about the company, and we can make reasonable inferences from who they are. The law allows us to do that....

\* \* \* \* \* \*

THE COURT: I want, please, to focus in on something specific, and that is, are you saying that there were internal corporate documents which referred to a box-and-hold scheme and were known to Armstrong and Burke? You said "all internal documents."

MR. FLEISCHMAN: You are asking me—

THE COURT: I am asking you a very simple question.

MR. FLEISCHMAN: You are asking an evidence question that is outside of the complaint.

THE COURT: The truth is, I have asked everybody evidence questions that are outside the complaint. I am asking you this question.

MR. FLEISCHMAN: I am telling you that—to make the representation—I don't want to give our hand away as to our investigation in this case. I don't think it is appropriate in this courtroom and in this setting for the sufficiency of this pleading to do so. But the short answer to your question is that Armstrong and Burke had available to them—

THE COURT: Had available because of their positions you are saying?

MR. FLEISCHMAN: Yes.

THE COURT: My question goes beyond that. My question is: Did they have actual knowledge? Did they operate with reckless conduct such as I have described?

MR. FLEISCHMAN: I think that the complaint alleges that sufficiently. It alleges that they had knowledge of all the internal information which would include the box-and-hold scheme.

\* \* \* \* \* \*

THE COURT: In effect, they knew in January 1994 of the, quote, box-and-hold scheme, correct?

MR. FLEISCHMAN: That is what the complaint alleges.

THE COURT: I am saying to you, did they know it because they saw memoranda that referred to a box-and-hold scheme or did they know it because they were generally reviewing internal financial materials that referred to the status of inventory?

MR. FLEISCHMAN: You may infer from the allegations in the complaint that since they saw all of the internal documents, internal financial documents, as it is recited in the complaint, that they knew of the box-and-hold scheme, that they knew of the warehouse, that they knew everything about it. You may infer that from the complaint, yes.

THE COURT: In fact, you have told me that there were documents that referred to a box-and-hold scheme.

MR. FLEISCHMAN: I have made that representation to the court.

THE COURT: My question to you now is, did they see those documents?

MR. FLEISCHMAN: There is no requirement, your Honor—

THE COURT: I didn't ask you that.

MR. FLEISCHMAN:—under the law.

THE COURT: I am not asking you about requirements. I am asking you the fact. Did they know it? Did they see it?

MR. FLEISCHMAN: As I stand here today before you, your Honor, I can't answer that question.

\* \* \* \* \* \*

THE COURT: You have four insiders [former employees of AnnTaylor] who apparently have given you some information and you apparently are telling me you are not just relying on the prospectus, the 10K, the 10Q, you are relying on more than that. You have conducted a year-long investigation, and I appreciate that. I am asking you now, can you answer this question: Did Armstrong and Burke communicate the fact of the inventory problem and the need for Ann Taylor to have written this off to any of the other defendants? Did they? I am not asking you what the requirement was.

MR. FLEISCHMAN: The answer is, if I knew the answer, your Honor, I don't know that I would be so forthcoming to tell you at this stage of the litigation, but the answer is, I don't know and I don't have to know.

(Tr. at 74–75, 77–78, 85–86, 87.)

In signing the complaint, plaintiffs' counsel represented to the Court that he had conducted a reasonable inquiry into the facts underlying this action. *See* Fed.R.Civ.P. 11(b). Despite this inquiry, counsel could not tell the Court whether Armstrong and Burke had ever seen documents or been informed of anything relating to a box-and-hold scheme or whether they had communicated such information to the corporate Merrill Lynch defendants. The complaint's allegations as to scienter on the part of any of the Merrill Lynch defendants, including Armstrong and Burke, are thus not pled with the particulari-

ty required by the PSLRA, nor supported by an adequate factual background.

We turn finally to the allegations brought under Section 20 of the 1934 Act[9] that various defendants are liable as control persons or control groups.[10] The Court is unable from the complaint alone to define the basis for these claims against defendants Kasaks, Armstrong, Burke, and AnnTaylor, and so we focus on those against "Merrill Lynch." In order to establish a claim for control person liability under Section 20, plaintiffs must establish (1) a primary violation of the 1934 Act, (2) control of the primary violator by the defendant, and (3) the defendant's culpability in the fraud perpetrated by the controlled person. *See Securities & Exchange Comm'n v. First Jersey Sec., Inc.,* 101 F.3d 1450, 1472 (2d Cir.1996). First, as the Court has found, plaintiffs have failed properly to plead a violation of the 1934 Act. Second, as we also have noted, plaintiffs have failed properly to allege scienter and/or culpability on the part of "Merrill Lynch." Even had we found a properly pled violation of the 1934 Act, we would not automatically impute this violation to "Merrill Lynch" as a controlling entity. *See Baesa,* 969 F.Supp. at 242 ("[T]he law in this circuit is clear that a subsidiary's fraud cannot be automatically imputed to its corporate parent."). *See also Chill v. General Elec. Co.,* 101 F.3d 263, 270 (2d Cir.1996) (holding that a parent company would, at the very least, have to have been deliberately blind to its subsidiary's fraud in order to have the requisite scienter).

In sum, the Court finds that the absence of adequate allegations of scienter in the complaint is fatal to plaintiffs' claims under Section 10(b) of the 1934 Act and Rule 10b–5, and that plaintiffs have failed to meet the minimal requirements to plead control person liability. The complaint will be dismissed.

---

**9.** This section states, in relevant part, that "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter . . . shall also be liable jointly and severally with and to the same extent as such controlled person. . . ." 15 U.S.C. § 78t(a).

## CONCLUSION

For the reasons set forth above, defendants' motions to dismiss the complaint under Fed.R.Civ.P. 12(b)(6) and Section 21D(b)(3) of the 1934 Act are granted. The complaint is dismissed. Plaintiffs are hereby granted leave, within thirty days of the date of this Opinion and Order, to amend and refile the complaint. In the event of such a filing, counsel for the parties are directed to jointly telephone Chambers to schedule further proceedings herein.

SO ORDERED.

---

**10.** Plaintiffs allege that defendants Kasaks, Armstrong and Burke controlled AnnTaylor, and that AnnTaylor controlled them. (Compl.¶ 135.) Plaintiffs also allege that "Merrill Lynch" controlled Armstrong and Burke, and therefore also controlled AnnTaylor, Kasaks, and Francis. (Compl.¶ 136.)