**In re ANCOR COMMUNICATIONS, INC., Securities Litigation.**

**Civ. No. 97–1696 (ADM/JGL).**

United States District Court, D. Minnesota, Fourth Division.

July 14, 1998.

of employee so that she should be considered to have no relevant past work experience."

Jack L. Chestnut, Karl L. Cambronne, Jeffrey D. Bores, Chestnut & Brooks, Minneapolis, MN, Leonard Barrack, Daniel E. Bacine, Robert A. Hoffman, Barrack, Rodos & Bacine, Philadelphia, PA, Richard Lockridge, Gregg M. Fishbein, Lockridge Grindal Nauen & Holstein, Minneapolis, MN, I. Stephen Rabin, Brian Murray, Rabin & Peckel, New York City, Leo W. Desmond, Randall Steinmeyer, Hellmuth & Johnson, Jeffrey H. Squire, Kaufman Malchman Kirby & Squire, New York City, Andrew C. McIntosh, Thomas G. Shapiro, Shapiro Haber & Urmy, Boston, MA, John Halebian, Wechsler Harwood Halebian & Feffer, New York City, for Plaintiffs.

Peter S. Hendrixson, Peter W. Carter, Paul J. Robbennolt, Dorsey & Whitney, Minneapolis, MN, for Defendants Ancor Communications, Inc., Lee B. Lewis, and Dale Showers.

## MEMORANDUM OPINION AND ORDER

MONTGOMERY, District Judge.

### INTRODUCTION

The above-entitled matter came on for hearing before the undersigned United States District Judge on April 24, 1998, pursuant to a motion to dismiss by Defendants Ancor Communications, Inc., Lee B. Lewis, and Dale Showers. This is a class action to recover damages allegedly suffered as a result of Defendants' violations of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b–5 promulgated thereunder. Plaintiffs also assert claims against the individual Defendants for controlling person liability under Section 20(a) of the Exchange Act.

### BACKGROUND

#### I. *The Parties*

Lead Plaintiffs Joseph I. Chao, Jeffery L. Cox, Fred W. Jones, John Orona, Richard Radman, Mark Somerville, and Philip Wong assert this action on behalf of themselves and all other persons or entities who purchased the common stock of Ancor Communications, Inc. ("Ancor") during the period May 15, 1996, through and including March 14, 1997. Complaint, ¶ 1.

Ancor is a Minnesota corporation with its principal place of business in Minnetonka, Minnesota. Ancor designs, manufacturers, and markets telecommunications and fiber-optic products. *Id.* at ¶ 8. Ancor common stock is publicly traded and is listed on the small cap market of the NASDAQ National Market System. *Id.*

Defendant Stephen O'Hara ("O'Hara") was, at all relevant times, President, Chief Executive Officer, and a Director of Ancor. Defendant O'Hara allegedly sold 10,000 shares of Ancor common stock at artificially inflated prices and realized proceeds in excess of $250,000. *Id.* at ¶ 9. Defendant Lee B. Lewis ("Lewis") was, at all relevant times, Vice President and Chief Financial Officer of Ancor. *Id.* at ¶ 10. Defendant Dale Showers ("Showers"), who is a co-founder of Ancor, was chairman of Ancor's Board of Directors since Ancor's genesis in July 1986 until his retirement in September 1997. *Id.* at ¶ 11. Defendant Showers allegedly sold 110,000 shares of Ancor stock during the class period at artificially inflated prices, for a profit of over $1.5 million. *Id.*

#### II. *Factual Background*

Ancor develops and markets products within the communications industry, including fiber optic cable for the transmission of large amounts of data at high speeds. *Id.* at ¶ 22. In 1988, Ancor became a member of the American National Standards Institute ("ANSI") Committee responsible for developing a fiber channel standard for high-speed

data transfer among workstations, mainframes, supercomputers, desktop computers, and peripherals. *Id.* at ¶ 23. In 1995, the Committee approved Fibre Channel as the ANSI standard. *Id.* From that point forward, Ancor focused almost exclusively on developing and marketing products related to Fibre Channel, including Fibre Channel switches, interface adapters, and application specific integrated circuits. *Id.* at ¶ 24.

### A. Ancor's Alleged Revenue Reporting Procedures

In the market for Fibre Channel products, Ancor faces significant competition from industry giants such as IBM and Hewlett-Packard. *Id.* at ¶ 26. During the class period, Ancor was still in the process of developing its products and its customer base. As a result, Ancor's public announcement of a new customer or a large sale immediately and positively affected the value of Ancor's stock. *Id.* at ¶ 28. According to Plaintiffs, this motivated Ancor's senior management to portray Ancor as a growing and successful company by overstating its reported revenues in violation of generally accepted accounting principles ("GAAP"). *Id.* at 29.

Ancor allegedly monitored the sales and earnings forecasts of securities analysts and compared the actual status of the company with the analysts' projections. In an effort to depict Ancor as a company that was meeting expectations, Ancor's senior management allegedly recorded as revenue sales to so-called "Channel Partners," or liaisons who attempted to find end-users to buy Ancor's products. *Id.* at ¶ 29. Channel Partners allegedly had no obligation to pay for the products unless they were ultimately sold to an end-user. *Id.* According to Plaintiffs, Ancor also misrepresented its revenues by recording as revenue sales to end-users for which there was an express or implied right of return. *Id.* Ancor also allegedly recorded as revenue certain "pass-through" sales from which Ancor derived no profit. *Id.*

At the end of the first quarter of 1995, for example, Plaintiffs allege that Ancor found a Channel Partner to accept $100,000 of inventory that had not been pre-sold. *Id.* at 31. Although the Channel Partner was merely warehousing the goods, Ancor allegedly included this $100,000 in its reported net sales for the quarter. *Id.* Plaintiffs also contend that Ancor requested that another representative, Lynbar, accept early shipment of an $80,000–$90,000 order so that the company could "book it for the quarter." *Id.*

### B. Ancor's Allegedly False and Misleading Statements

In its May 15, 1996 press release, which marks the beginning of the class period, Ancor announced that it had entered into a multi-million dollar contract with Sequent, a significant company within the industry. *Id.* at ¶ 32. Pursuant to the agreement, Sequent would resell Ancor Fibre Channel switches in conjunction with Sequent's NUMA–Q Systems. The May 15 press release stated that the Sequent agreement had "a potential contract value of up to $30 million over the next two years." *Id.* at ¶ 33. In response to the press release, Ancor's stock price soared from $14.25 per share on May 14 to a high of $41.375 on May 24, with an average daily trading volume of 2 million shares for the majority of that period. *Id.* at ¶ 35.

Plaintiffs contend the May 15 press release was misleading because Ancor failed to disclose the significant possibility that Ancor's products would be incompatible with Sequent's products. *Id.* at ¶ 36. Before May 15, representatives of Ancor and Sequent preliminarily assessed the compatibility of Ancor's and Sequent's products. Because Sequent's NUMA–Q system was not fully developed, Plaintiffs assert that Ancor knew there were significant compatibility issues that could be fatal to the contract. *Id.* at ¶ 37.

Ancor also allegedly overstated its second and third quarter revenues for 1996. On August 14, 1996, Ancor issued a press release announcing its financial results for the second quarter of 1996, in which it reported revenues of approximately $2.1 million. *Id.* at ¶ 39. Defendant O'Hara publicly attributed this success to the growing acceptance of Fibre Channel technology and the advantages offered by Ancor's products. *Id.* Defendants made similar representations in Ancor's Form 10–QSB filed with the SEC and certified that the financial statements were

prepared in accordance with GAAP. *Id.* at ¶ 40. This scenario was repeated on November 7, 1996, when Ancor reported revenues of $1.9 million for the third quarter of 1996 and, concomitantly, when it filed its third quarter 10–Q. *Id.* at ¶ 41. Plaintiffs contend that the August 14 and November 7 press releases are misleading because they attribute revenue growth to "increased acceptance" in the market rather than improper revenue recognition that contravenes GAAP. *Id.* at 43.

In a press release dated January 27, 1997, Ancor announced that Sequent had canceled the contract due to incompatibility. *Id.* at ¶ 52. The price of Ancor's stock dropped almost 30%, on a trading volume of almost 1 million shares. *Id.* at 53. The next day, John G. Kinnard & Co. issued a report downgrading Ancor's stock and noting the "damage to management's credibility." *Id.* at 54.

On February 26, 1997, Ancor issued a press release announcing its results for the fourth quarter of 1996. Net sales were less than the net sales for the fourth quarter of 1995 as a result of a $660,000 product return credit stemming from the cancellation of the Sequent contract and the establishment of a $300,000 product return allowance reserve. *Id.* at ¶ 55. On March 14, 1997, Ancor issued a press release revising the 1996 fourth quarter returns announced two weeks earlier. *Id.* at ¶ 56. Ancor had improperly included zero-gross margin sales, or "pass-through" sales, in its calculations. *Id.* Ancor also adjusted its SEC filings on March 14, 1997. *Id.* at ¶ 57. As a result of the March 14, 1997 disclosures, the price of Ancor's stock plummeted 30% in one day on trading volume of over 1 million shares. *Id.* at ¶ 61.

Following the March 14 revelations, John G. Kinnard issued a report that stated: "When coupled with two previous examples in 1996 (Sequent contract cancellation and third quarter systems integration return) where revenue had to be reversed, we question Ancor's revenue recognition policies and believe this has created a serious management credibility issue." *Id.* at ¶ 62. On April 16, 1997, Ancor announced that Defendant O'Hara had resigned as President and CEO. *Id.* at ¶ 63.

## DISCUSSION

### I. *Standard for a Motion to Dismiss*

In considering a motion to dismiss, the pleadings are construed in a light most favorable to the nonmovant, and the facts alleged in the complaint must be taken as true. *Hamm v. Groose*, 15 F.3d 110, 112 (8th Cir. 1994); *Ossman v. Diana Corp.*, 825 F.Supp. 870, 879–80 (D.Minn.1993). Any ambiguities concerning the sufficiency of the claims must be resolved in favor of the nonmovant. *Ossman*, 825 F.Supp. at 880. A complaint should be dismissed "only if it is clear that no relief can be granted under any set of facts that could be proved consistent with the allegations." *Frey v. City of Herculaneum*, 44 F.3d 667, 671 (8th Cir.1995) (citations omitted); *Hafley v. Lohman*, 90 F.3d 264, 266 (8th Cir.1996). "A motion to dismiss should be granted as a practical matter ... only in the unusual case in which the nonmovant includes allegations that show on the face of the complaint that there is some insuperable bar to relief." *Frey*, 44 F.3d at 671.

### II. *Section 10(b) and Rule 10b–5 Claims*

Section 10(b) of the Securities and Exchange Act of 1934 makes it unlawful to use in connection with "the mails or facilities of interstate commerce" any "manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. § 78j. Rule 10b–5, promulgated under section 10(b), prohibits the making of "any untrue statement of a fact that would render any statements made misleading in the light of circumstances . under which they were made." 17 C.F.R. § 240.10b–5(b). The elements of a Section 10(b) or Rule 10b–5 claim are: (1) a false statement or an omission of a material fact occurring in connection with the purchase or sale of a security; (2) reliance; (3) scienter; and (4) resulting damages. *Alpern v. UtiliCorp United, Inc.*, 84 F.3d 1525, 1533–34 (8th Cir.1996); *Brogren v. Pohlad*, 960 F.Supp. 1401, 1403–04 (D.Minn.1997).

### III. *Pleading Requirements: Rule 9(b) and the Private Litigation Securities Reform Act.*

■ Federal Rule of Civil Procedure 9(b) provides that, "[i]n all averments of fraud or

mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." The courts have applied Rule 9(b) strictly in the context of securities fraud cases as a means of deterring frivolous lawsuits. *See Weisburgh v. St. Jude Medical, Inc.,* 158 F.R.D. 638, 641 (D.Minn.1994). In securities litigation, Rule 9(b) serves three purposes:

> First, it deters the use of complaints as a pretext for fishing expeditions of unknown wrongs designed to compel in terrorem settlements. Second, it protects against damage to professional reputations resulting from allegations of moral turpitude. Third, it ensures that a defendant is given sufficient notice of the allegations against him to permit the preparation of an effective defense.

*Id.,* (citing *TCF Banking and Sav., F.A. v. Arthur Young & Co. .,* 706 F.Supp. 1408, 1411 (D.Minn.1988)); *see also Parnes v. Gateway 2000, Inc.,* 122 F.3d 539, 549 (8th Cir.1997). Rule 9(b), however, does not abrogate the general rule that "pleadings are to be construed in a light most favorable to the pleader and accepted as true [and should not be dismissed] unless it appears that plaintiff can prove no set of facts that would entitle him to relief." *Ross v. Bolton,* 904 F.2d 819, 823 (2nd Cir.1990).

In addition to Rule 9(b), Congress enacted the Private Securities Litigation Reform Act of 1995 ("PSLRA"), which amends the Securities Exchange Act of 1934.[1] Under the PSLRA, a complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1). The PSLRA also requires that the complaint, "with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that

the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2).

■ In the instant case, Defendants contend that Plaintiffs have failed to adequately plead: (1) actionable misrepresentations or omissions of material facts; and (2) that Defendants acted with scienter. In support of their assertion that Plaintiffs failed to plead with sufficient particularity that Defendants made fraudulent misrepresentations or omissions, Defendants maintain that Plaintiffs failed to plead facts integral to the alleged fraud, such as who, what, where, when and how. Plaintiffs' Complaint, however, provides sufficient information regarding the circumstances surrounding the alleged fraud. Defendants rely, in part, on a recent case decided by the Eighth Circuit Court of Appeals, *In re NationsMart Corp. Securities Litigation,* 130 F.3d 309 (8th Cir.1997), in which the Eighth Circuit affirmed the dismissal of plaintiffs' 10b–5 claim for failure to plead with particularity. *Id.* at 320. The Eighth Circuit noted:

> In the complaint, the plaintiffs allege some misstatements of fact, such as that NationsMart's management misrepresented negative business trends, misrepresented the costs of opening new stores, and omitted material information about the operation of NationsMart stores. The plaintiffs did not quantify these business trends or say which business trends were described inaccurately in the Prospectus. They did not demonstrate how the actual cost of opening a new store differed from the cost found in the Prospectus. And the plaintiffs did not plead specific facts showing how the omissions from the Prospectus were material.

*Id.* at 321 (internal citations omitted). Unlike the plaintiffs in *NationsMart,* who failed to plead even basic facts describing the alleged fraud, Plaintiffs in the instant case have provided detailed information regarding Defendants' alleged fraudulent activity. Plaintiffs' Complaint details Ancor's contract with Sequent, including explanations such as who the parties to the contract were, the

---

1. The PSLRA applies to private securities litigation initiated after December 22, 1995. PSLRA,

Pub.L. No. 104–67, § 108, 109 Stat. 737 (1995).

purpose of the contract, when it was made public, why it was significant for Ancor, why the press release regarding the contract was misleading when made, and the response of the investment community to the contract. Complaint, ¶¶ 32–38.

Similarly, regarding Plaintiffs' allegations of financial fraud and the alleged revenue recognition practices, the Complaint includes details of the machinations allegedly involved in artificially inflating Ancor's stock prices. For example, the Complaint describes a transaction in which Ancor convinced a Channel Partner to accept $100,000 of inventory that had not been pre-sold, in an effort to meet analysts' projections. *Id.* at ¶ 31. The Complaint alleges that Ancor subsequently included the $100,000 "sale" in its report of $611,531 net sales for the quarter. In another specific example of alleged manipulation of sales figures, Ancor requested that a representative known as Lynbar accept early shipment of an $80,000—$90,000 order so that the company could "book it for the quarter." *Id.*

In discussing the specific misleading statements in the press releases and accompanying SEC filings for the second and third quarter of 1996, Plaintiffs provide examples which further satisfy the pleading requirements of the PSLRA. For example, the Complaint states:

> As the second quarter of 1996 was ending, Ancor had only $1.85 million in revenue, which was substantially below analysts' expectations. Accordingly, before the quarter ended, Defendants caused Ancor to ship $250,000 of product to Comnet, a Channel Partner located in Milwaukee, Wisconsin. Comnet had no obligation to pay for the goods unless they were re-sold to an end-user. Ancor still booked the $250,000 in revenue in the second quarter.

Complaint, at ¶ 45. The Complaint also includes detailed descriptions of GAAP and the ways in which Defendants' practices allegedly violated GAAP. *See, e.g.,* Complaint, at ¶¶ 39–51. Consequently, Plaintiffs have satisfied their obligation under Rule 9(b) and the PSLRA to plead fraudulent conduct with sufficient particularity. The information in the Complaint provides ample notice to Defendants of any alleged wrongdoing, even under the more stringent PSLRA pleading requirements.

■ Defendants also assert that Plaintiffs failed to sufficiently plead facts supporting an inference of scienter, a "mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). Before Congress enacted the PSLRA, the rule regarding scienter in the Second Circuit was that "a 'strong inference' might be established by showing either motive and opportunity to commit fraud or circumstantial evidence of either reckless or conscious behavior." *Novak v. Kasaks,* 997 F.Supp. 425, 1998 WL 107033, *5 (S.D.N.Y. March 10, 1998). Courts are divided on the question whether the PSLRA adopted this Second Circuit standard for pleading scienter or whether the Act strengthened the standard by requiring more than motive and opportunity or recklessness. Defendants contend that under the PSLRA, allegations of motive and opportunity no longer suffice to plead a strong inference of scienter. Relying on *In re Silicon Graphics Sec. Litig.,* 970 F.Supp. 746 (N.D.Cal.1997), Defendants assert that Plaintiffs must allege, *at a minimum,* specific facts that constitute circumstantial evidence of *conscious* behavior by Defendants. The Eighth Circuit has not yet addressed this issue. Because Plaintiffs have arguably satisfied even the more stringent test of conscious behavior, this Court need not decide whether motive and opportunity or recklessness would suffice under the PSLRA.

With respect to the Sequent contract, Plaintiffs' Complaint provides, "Defendants knew that Ancor's products were not compatible with Sequent's and that Sequent could return Ancor's products and cancel the agreement if such products could not be successfully integrated with Sequent's." Complaint, at ¶ 73. In a similar case decided under the PSLRA, *Epstein v. Itron, Inc., et al.,* 993 F.Supp. 1314 (E.D.Wash.1998), the district court for the Eastern District of Washington held that the plaintiff's allegations satisfied the pleading requirements of the PSLRA. *See Id.,* Hoffman Aff., Ex. 4. In

*Itron,* the plaintiff alleged that the defendant failed to disclose a technological incompatibility between two of its products. Because the transaction or compatibility was of paramount importance to the company, the court concluded that knowledge of the technological incompatibility, or the strong likelihood of such incompatibility, may be imputed to the company. The court held:

> [F]acts critical to a business's core operations *or an important transaction* generally are so apparent that their knowledge may be attributed to the company and its key officers. In this case, Plaintiff's allegations regarding the incompatibility of Itron's ERTs and its Fixed Network AMR are these types of facts. If it is true, as Plaintiff alleges, that Itron's core product is technologically incapable of meeting requirements that are central to Itron's continued survival as a business entity, it can be strongly inferred that key officers ... had knowledge of this fact.

Slip Op. at 20–21 (emphasis added). The $30 million contract with Sequent was undeniably the most significant contract in Ancor's history. The revenue expected pursuant to the Sequent contract would have been extraordinary for Ancor based on the revenue of its preceding fiscal years. As in *Itron,* knowledge of the potential incompatibility, within the context of this highly significant contract, may be imputed to Defendants and supports a strong inference of scienter. Although in the instant case the incompatibility arose between products of different companies, this does not negate the inference of knowledge. Plaintiffs' allegations, which must be taken as true on a motion to dismiss, include an assertion that representatives from Ancor and Sequent discussed compatibility with respect to the Sequent contract. As further evidence that Defendants knew compatibility was potentially a major obstacle, Plaintiffs contend that the contract provided an escape clause for Sequent if the compatibility problems could not be resolved.

Moreover, the circumstances surrounding revenue recognition also support a strong inference of conscious behavior. The Ninth Circuit Court of Appeals, sitting *en banc,* recently recognized that a "company that 'substantially overstate[s] its revenues by reporting consignment transactions as sales ... mak[es] false or misleading statements of material fact.'" *Cooper v. Pickett,* 137 F.3d 616, 626 (9th Cir.1997) (citing *In re Worlds of Wonder Sec. Litig.,* 35 F.3d 1407, 1418 (9th Cir.1994)); *see also Malone v. Microdyne Corp.,* 26 F.3d 471, 478 (4th Cir.1994) ("We cannot find a single precedent ... holding that a company may violate FAS 48 and substantially overstate its revenues by reporting consignment transactions as sales without running afoul of Rule 10b–5").[2] The complaint in *Cooper,* like the Complaint in the instant case, "alleges the GAAP required [defendant] to defer revenue recognition on these shipments until payment was received, and that [defendant] failed to do so, instead reporting them immediately in order to overstate its revenues." *Id.*

In the instant case, Defendants allegedly engaged in improper revenue recognition in contravention of GAAP. Some courts have held that violations of GAAP, standing alone, do not give rise to a strong inference of scienter. *See e.g., Chill v. General Electric Co.,* 101 F.3d 263, 270 (2nd Cir.1996). Other courts have held, however, that violations of GAAP, in combination with other factors, may support a strong inference of scienter. In a case involving improper revenue recognition in violation of GAAP, the district court for the Western District of Pennsylvania held:

> We need not determine the proper scienter requirement mandated by the PSLRA, for even under the more rigid "conscious behavior" test, the plaintiffs have adequately plead scienter. That is, the defendants are said to have knowingly: engaged in an "inventory parking scheme" with certain distributors to fraudulently conceal the deteriorating state of the Company's business and to artificially inflate its financial statements, engaged in improper accounting practices in violation of GAAP for purposes of revenue recognition, and released

**2.** Defendants contend that *Cooper* is inapposite, because it is a pre-PSLRA case. Although Defendants are correct to the extent that Plaintiffs rely on *Cooper* for determining the sufficiency of pleading under the PSLRA, *Cooper* is still relevant in other respects.

a false and misleading statement concerning the Company's participation in an aborted project . . . .

*Bell v. Fore Systems, Inc.,* 17 F.Supp.2d 433 (W.D.Penn.1998). The allegations in *Bell* are similar to the allegations in the instant case. In *Bell,* the court determined that Plaintiffs' allegations regarding violations of GAAP were probative of scienter and constituted facts giving rise to a strong inference of knowing or conscious behavior. *Id.,* 17 F.Supp.2d at 439–40.

In another case, *Marksman Partners v. Chantal Pharmaceutical Corp.,* 927 F.Supp. 1297 (C.D.Cal.1996), the court applied the stricter "conscious behavior" test under the PSLRA and determined that:

> A violation of GAAP may be used to show that a company overstated its income, which may be used to show the scienter for a violation of Section 10(b) and Rule 10b–5. Specifically, an accounting violation of SFAS 48 can constitute one basis for a finding of scienter. Although it is true that a violation of GAAP in itself will generally not be sufficient to establish fraud, when combined with other circumstances suggesting fraudulent intent, however, allegations of improper accounting may support a strong inference of scienter.

*Id.* at 1313 (internal citations omitted). The same is true for the instant case. As further evidence of conscious behavior, Defendants continually represented on SEC filings that the financial results were prepared in accordance with GAAP. Moreover, the *Marksman* court noted that the sale of stock by company insiders after the rise in stock value, which was allegedly precipitated by fraudulent disclosures, provided additional support for a strong inference of conscious behavior. Similar circumstances exist in the instant case. Accordingly, for the reasons set forth above, Plaintiffs have satisfied their pleading burdens under the PSLRA.

Defendants assertion that the Section 20(a) claim should be dismissed is solely contingent on dismissal of Plaintiffs' Section 10(b) and Rule 10b–5 claim. Defendants do not suggest that there is any independent basis for dismissing the Section 20(a) claim. Because

Defendants failed to establish that Plaintiffs' Section 10(b) and Rule 10b–5 claim should be dismissed, this Court will deny Defendants' motion to dismiss as it relates to liability for "controlling" persons under Section 20(a).

### CONCLUSION

Based on the foregoing, and all of the files, records and proceedings herein **IT IS HEREBY ORDERED** that:

1. Defendants' motion to dismiss is **DENIED.**