**In re K–TEL INTERNATIONAL, INC.,
SECURITIES LITIGATION.**

Nos. Civ. 98–2494 ADM/JGL, Civ. 98–
2480 ADM/JGL, Civ. 98–2519 ADM/
JGL, Civ. 98–2520 ADM/JGL, Civ. 98–
2526 ADM/JGL, Civ. 98–2531 ADM/
JGL, Civ. 98–2534 ADM/JGL, Civ. 98–
2557 ADM/JGL, Civ. 98–2558 ADM/
JGL, Civ. 98–2559 ADM/JGL, Civ. 98–
2563 ADM/JGL, Civ. 98–2580 ADM/
JGL, Civ. 98–2634 ADM/JGL, Civ. 98–
2649 ADM/JGL, Civ. 98–2663 ADM/
JGL, Civ. 99–92 ADM/JGL, Civ. 99–148
ADM/JGL, Civ. 99–149 ADM/JGL, Civ.
99–150 ADM/JGL, Civ. 99–209 ADM/
JGL, Civ. 99–214 ADM/JGL, Civ. 99–
215 ADM/JGL, Civ. 99–216 ADM/JGL.

United States District Court,
D. Minnesota.

July 31 2000.

Richard A. Lockridge, Karen M. Hanson, Gregg M. Fishbein, Lockridge, Grindal, Nauen, P.L.L.P., Minneapolis, MN, Stephen J. Fearon, Jr., James Jay Seirmarco, Abbey, Gardy & Squitieri, LLP, New York City, William S. Lerach, Katherine L. Blanck, Kimberly C. Epstein, Milberg, Weiss, Bershad, Hynes & Lerach LLP, San Francisco, CA, Frederic S. Fox, Janine R. Azriliant, Kaplan, Kilsheimer & Fox, LLP, New York City, Garrett Blanchfield, Reinhardt & Anderson, St. Paul, MN, John Halebian, Scott A. Kam-

ber, Wechsler, Harwood, Halebian & Feffer, LLP, New York City, for the lead plaintiffs and the class.

Karl L. Cambronne, Chestnut & Cambronne, P.A., Minneapolis, MN, Jonathan J. Lerner, Lea Haber Kuck, Jacob Hollinger, Skadden, Arps, Slate, Meagher & Flom LLP, New York City, for the defendants.

## MEMORANDUM OPINION AND ORDER

MONTGOMERY, District Judge.

### I. INTRODUCTION

In this class action, Plaintiffs allege Defendant K-tel International, Inc. ("K-tel"), through individually named Defendants Philip Kives ("Kives"), Lawrence Kieves ("Kieves"), David Weiner ("Weiner"), Corey Fischer ("Fischer") and Jeffrey Mark Koblick ("Koblick") (collectively, "Individual Defendants"), violated Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), codified at 15 U.S.C. § 78j, as well as Securities and Exchange Commission (the "SEC") Rule 10b–5 promulgated thereunder. Plaintiffs also allege claims against Defendants Kives, Kieves, and Koblick, asserting Section 20(a) control person and Section 20A insider trading claims.

On May 10, 2000, the undersigned United States District Judge heard Defendants' Motion to Dismiss [Doc. No. 44] the Amended Consolidated Class Action Complaint (the "Amended Complaint").[1] For the reasons set forth below, the motion is granted.

### II. BACKGROUND[2]

#### A. Share Price: Rise and Fall

K-tel is a Minnesota corporation with its principal place of business in Plymouth, Minnesota. K-tel markets and distributes

entertainment and consumer products, including prerecorded music compilations. K-tel's music operations consist of the sale of pre-recorded music through traditional and, more recently, Internet retail distribution. *See* Am.Compl. ¶ 19.

K-tel common stock is publicly traded on the NASDAQ National Market System (the "NMS"). Plaintiffs' allegations of securities fraud have one overarching and recurring theme: K-tel concealed its inability to comply with the National Association of Securities Dealers' (the "NASD") $4 million minimum tangible net asset requirement necessary for continued listing on the NMS. Plaintiffs contend Individual Defendants violated accounting principles to conceal the risk of delisting and boasted collaborations with significant market players to boost share price, both culminating in profitable insider sales.

K-tel's share price began climbing in April 1998. On April 21, 1998, K-tel declared a two-for-one common stock split in the form of stock dividends paid to shareholders of record on May 1, 1998. *See* Form 10–K at Part II, Item 5. To capitalize on the fast-growing E-commerce business expansion, on May 1, 1998, K-tel launched K-tel Express, an on-line music retailing business. *See* Am.Compl. ¶ 19. K-tel's share price quickly increased significantly, after adjusting for the two-for-one stock split. *See* March 31, 1998 Form 10–Q at ¶ 5. For example, within one month, K-tel's share price jumped from $3.31 (April 6, 1998) to $33.94 (May 5, 1998). *See* NASDAQ Pricing History and Form 10–K at Part II, Item 5 (Fourth Quarter High of $39.94 and Low of $3.25).

On May 5, 1998, four days after the stock split, K-tel announced the financial results for its third quarter ending March 31, 1998, referencing a decline in sales and income. Three days later, K-tel filed its

---

1. Defendant Koblick submitted a separate memorandum in support of the motion to dismiss.

2. During oral arguments on May 10, 2000, both Plaintiffs and Defendants utilized the

attached illustrative time-line, compiled by Defendants. *See* Appendix A. The time-line is helpful to a general overview of some of the most pertinent events and is therefore appended to this Order.

Form 10–Q for the period ending March 31, 1998 (the "March 10–Q") that repeated the negative financial information previously released in the May 5 announcement. Defendants Kives, Weiner, and Fischer signed the March 10–Q. *See* Am.Compl. ¶¶ 20a, 20c, 20d. Between May 5, 1998 and June 9, 1998, K-tel's share price dropped from $33.94 to $11.25. *See* NASDAQ Pricing History.

On September 28, 1998, K-tel filed a Form NT 10–K requesting an extension of time to file its Form 10–K for the fiscal year ending June 30, 1998 (the "June 10–K"). *See id.* at ¶ 64. Pursuant to its extension request, K-tel filed the June 10–K on October 13, 1998. Kives, Kieves, Weiner, Fischer, and Koblick signed the June 10–K. *See id.* at ¶¶ 20a–d. According to the Amended Complaint, in the June 10–K, K-tel:

> further disclosed in its consolidated balance sheet that it had shareholders' equity of $3,774,000.... *K–Tel thereby represented that it was $226,000 below the NASDAQ requirements for continued listing.*

Am.Compl. ¶ 66 (emphasis added). On October 19, 1998, the NASD notified K-tel that K-tel's net tangible assets had fallen below the $4 million minimum level necessary for continued listing. *See id.* ¶ 77. K-tel requested a hearing before the NASDAQ Listing Qualifications Panel to obtain a temporary extension to raise additional capital to meet the net tangible asset minimum. *See* Cambronne Aff., Ex. H at 11. K-tel did not publicly disclose either the NASD notification letter or K-tel's request for a temporary extension to meet the $4 million requirement.

On November 3, 1998, K-tel and Playboy announced their partnership for an on-line music store. *See* Am.Compl. ¶ 73. One week later, on November 10, K-tel announced a separate partnership with Microsoft. *See id.* at ¶ 74. Also, on Novem-

ber 16, 1998, K-tel filed the Form 10–Q for the period ending September 30, 1998 (the "September 10–Q"), reflecting negative financial results and, for the first time, publicly disclosing the NASD risk-of-delisting letter received approximately one month earlier. *See id.* at ¶¶ 76, 77. Numerous lawsuits alleging K-tel securities fraud followed on the heels of the filing of the September 10–Q. On February 8, 1999, the NASDAQ Hearing Panel notified K-tel that it would not delist K-tel as K-tel had "evidenced compliance with all requirements for continued listing." Form 10–Q (for the period ended December 31, 1998) at 11.

Twenty-two individual cases against K-tel have been consolidated with the above-titled class action, originally filed on November 19, 1998. Plaintiffs later filed an amended consolidated class action complaint on July 19, 1999 (after the resolution of the delisting issue) that, *inter alia,* commenced the class period on May 8, 1998, six months earlier than the original commencement date of November 3, 1998. *See* Complaint ¶ 1. Plaintiffs (the "Class") are persons and entities who purchased or otherwise acquired the common stock of K-tel between May 8, 1998 through approximately 11:36 a.m. on November 17, 1998 (the "Class Period") and who sustained a financial loss as a result of those purchases. *See* Am.Compl. ¶¶ 2, 13.

By extending the commencement date back to May 8, 1998, the Class Period now captures approximately 2.7 million shares of K-tel common stock sold by four Individual Defendants[3] between May 8, 1998 and June 9, 1998. *See* Am.Compl. ¶ 79. In contrast, the original class period with the November 3, 1998 commencement date encompassed only 15,000 K-tel shares sold by Fischer on November 17, 1998 as well as 27,200 shares *bought* by Koblick on November 13, 1998. *See id.;* Cambronne

---

**3.** The four Individual Defendants are: (1) Kives, Chief Executive Officer; (2) Weiner, President until approximately August 1998; (3) Fischer, Chief Financial Officer; and (4) Koblick, Director. *See* Am.Compl. ¶¶ 20a–d.

Plaintiffs do not allege Kieves, President of K-tel, sold any shares during the Class Period. *See id.*

Suppl.Aff., Ex. A (Koblick's December 7, 1998 Form 4). Plaintiffs allege Individual Defendants received more than $41 million dollars for K-tel stock they sold during the Class Period. *See* Am.Compl. ¶ 79.

### B. Allegations of GAAP Violations

In 1997, K-tel formed a marketing subsidiary (the "Subsidiary") to facilitate media-buying services for third-parties and to market products through infomercials produced by third parties. *See id.* at ¶ 6. According to Plaintiffs, by January 1998, K-tel "saw its asset base seriously deteriorate as a result of the Subsidiary's accumulated losses." *Id.* at ¶ 7. In order to conceal the losses and possible NMS delisting, K-tel, Plaintiffs argue, made misrepresentations in its March 10–Q and June 10–K.

#### 1. FAS 121

Given the Subsidiary's accumulated losses, Plaintiffs maintain K-tel was required to take a $1.498 million write-off pursuant to Generally Accepted Accounting Procedures ("GAAP"). The Complaint charges that Defendants failed to acknowledge the write-off of "non-useable and worthless infomercials and other media items purchased by the Subsidiary." *Id.* at ¶ 42.

Plaintiffs allege that K-tel did not recognize the write-off as required because doing so would result in net tangible assets of less than $4 million, risking NSM delisting. *See id.* ¶ 6. Plaintiffs argue that, pursuant to Financial Accounting Standard ("FAS") 121, Defendants were to review assets for impairment as of March 31, 1998 and to take the $1.498 million charge to income. *See id.* ¶¶ 37–44, 48, 62, 63. By concealing K-tel's vulnerability to NMS delisting, Plaintiffs assert that Defendants artificially inflated the price of K-tel stock and hoped to generate interest in a private placement or secondary offering. *See id.* The Complaint alleges that the write-off was not fully recognized until March 31, 1999. *See* Defs.' Mem.Opp. at 12 n. 14.

#### 2. FAS 5

The March 10–Q disclosed that "[a]s of March 31, 1998, due to accumulated losses to date of $1,300,000 [K-tel] has curtailed most of [the] media-buying operations [of the Subsidiary] and will now focus on its existing primary business...." *See id.* at ¶ 37. Plaintiffs allege this statement was misleading and was inconsistent with FAS 5 because the March 10–Q did not disclose (1) contracts "likely" to result in future losses of $1.8 million and (2) various losses accrued by May 8, 1998 as well as losses to be accrued in the future. *See id.* at ¶¶ 45, 47.

The alleged GAAP violations form the heart of the Plaintiffs' response to the motion to dismiss. Plaintiffs argue they have alleged sufficient facts showing conscious wrongdoing by the Defendants as well as circumstantial evidence from which wrongdoing may be inferred, including that Defendants had motive and opportunity to perpetrate fraud against Plaintiffs.

### III. DISCUSSION

#### A. Motion to Dismiss For Failure to State a Claim

In considering a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), the pleadings are construed in a light most favorable to the nonmoving party, and the facts alleged in the complaint must be taken as true. *See, e.g., Parnes v. Gateway 2000, Inc.,* 122 F.3d 539, 545–46 (8th Cir.1997) (citing *Fusco v. Xerox Corp.,* 676 F.2d 332, 334 (8th Cir.1982)); *In re Green Tree Fin. Corp. Stock Litig.,* 61 F.Supp.2d 860, 868 (D.Minn.1999). A complaint should be dismissed only if it is clear that no relief can be granted under any set of facts that could be proved consistent with the allegations. *Parnes,* 122 F.3d at 546; *Frey v. City of Herculaneum,* 44 F.3d 667, 671 (8th Cir.1995) (citations omitted). Courts reject, however, plaintiffs' "conclusory allegations of law and unwarranted inferences." *Silver v. H&R Block, Inc.,* 105 F.3d 394, 397 (8th Cir.1997). Where ap-

propriate, the Court "may consider all portions of documents relied upon in plaintiffs' complaints and of undisputed authenticity, even though they are not physically attached to the pleading." *Green Tree*, 61 F.Supp.2d at 868 (citing *Vizenor v. Babbitt*, 927 F.Supp. 1193, 1198 (D.Minn. 1996)). Additionally, the Court may consider documents of uncontested authenticity that are filed with the SEC. *See id.*

The elements of a Section 10(b) or Rule 10b–5 claim are: (1) a false statement or an omission of a material fact occurring in connection with the purchase or sale of a security; (2) reliance; (3) scienter; and (4) resulting damages. *See, e.g., Alpern v. UtiliCorp United, Inc.*, 84 F.3d 1525, 1533–34 (8th Cir.1996); *Brogren v. Pohlad*, 960 F.Supp. 1401, 1403–04 (D.Minn.1997). To survive a motion to dismiss in a securities fraud case, Plaintiffs must meet the pleading standards under both Fed. R.Civ.P. 9(b) and the more recently enacted Private Securities Litigation Reform Act (the "PSLRA").[4] Rule 9(b) provides the general pleading standard for fraud while the PSLRA specifically addresses the fraud pleading requirement in the securities context. Pursuant to Rule 9(b), "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." Similarly, the PSLRA requires that "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2).

Both Rule 9(b) and the PSLRA require that a complaint must set forth with *particularity* facts which create the *strong inference of scienter*. *See Green Tree*, 61 F.Supp.2d at 869. Plaintiffs may not avoid the heightened pleading requirements of Rule 9(b) and the PSLRA by "claiming investigations by counsel." *See id.* at 872 (citing *In re Ceridian Corp. Sec.*

*Litig.*, No. 97–2044 MJD/AJB, slip op. at 25 (D.Minn., March 29, 1999)).

The pleading required to satisfy the *strong inference of scienter* component of the standard has been controversial between the circuits as well as within this District. *See, e.g., Green Tree*, 61 F.Supp.2d at 868. The Eighth Circuit has not yet directly addressed the issue.

Part B, *infra*, addresses whether Plaintiffs have pled facts with sufficient particularity. Part C focuses on whether Plaintiffs have presented facts adequate to support a strong inference of scienter.

## B. Pleading with Particularity: GAAP Violations

The United States Supreme Court has recognized that "[f]ar from being a single-source accounting rulebook, GAAP 'encompasses the conventions, rules, and procedures that define accepted accounting practice at a particular point in time.' GAAP changes and, even at any one point, is often indeterminate." *Shalala v. Guernsey Mem. Hosp.*, 514 U.S. 87, 101, 115 S.Ct. 1232, 131 L.Ed.2d 106 (1995) (citations omitted). Because GAAP "is a term of art encompassing a wide range of acceptable procedures, such that 'an ethical, reasonably diligent accountant may choose to apply any of a variety of acceptable accounting procedures when that accountant prepares a financial statement,'" GAAP violations must be pled with particularity. *Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1021 (5th Cir.1996). Accordingly, Plaintiffs must plead pertinent facts, including particular transactions as well as the underlying basis for any figures asserted by Plaintiffs, demonstrating that the specified accounting principle applies. *See, e.g., Greebel v. FTP Software, Inc.*, 194 F.3d 185, 203–04 (1st Cir.1999); *Decker v. Massey–Ferguson, Ltd.*, 681 F.2d 111, 116 (2nd Cir.1982); *Hockey v. Medhekar*, 30 F.Supp.2d 1209, 1216 (N.D.Cal.1998).

---

**4.** Congress enacted the PSLRA in 1995, amending the Exchange Act.

### 1. FAS 121

FAS 121 applies to long-lived assets and certain identifiable intangibles either "to be held and used" or "to be disposed of." FAS 121. The Complaint addresses long-lived assets and certain identifiable intangibles to be held and used. *See* Am.Compl. ¶ 33. FAS 121 requires that:

> *long-lived assets* and certain *identifiable intangibles to be held and used* by an entity be reviewed for impairment whenever events or changes in circumstances indicate that the *carrying amount of an asset* may not be recoverable. In performing the review for recoverability, the entity should *estimate the future cash flows* expected to result from the use of the asset and its eventual disposition. *If the sum of the future cash flows (undiscounted and without interest) is less than the carrying amount, an impairment loss is recognized.* Otherwise, an impairment loss is not recognized. Measurement of an impairment for long-lived assets and certain identifiable intangibles that an entity expects to hold and use should be based on the fair value of the asset.

FAS 121, Summary (emphasis added).

Without identifying which assets or identifiable intangibles are implicated by K-tel's alleged FAS 121 violation, Plaintiffs merely assert that "Defendants knew or were reckless in not knowing prior to the issuance of the [March 10–Q] that *assets* aggregating no less than $1,498,000 had been impaired as of the date of the financial statements." Am.Compl. ¶ 41 (emphasis added). Plaintiffs' conclusory allegation that an impairment loss existed and that K-tel was motivated to hide the losses suffered by the Subsidiary is insufficient. The PSLRA "requires more." *Malin v. Ivax Corp.*, 17 F.Supp.2d 1345, 1360 (S.D.Fla.1998).

There must be the requisite "long-lived assets" or "certain identifiable intangibles" before FAS 121 becomes applicable and before an entity is required to perform a review for recoverability. Even after De-

fendants' argument that Plaintiffs have inappropriately failed to specify either the pertinent long-lived assets or identifiable intangibles, Plaintiffs responded only with conclusory statements alleged in the Complaint. *Compare* Defs.' Mem.Supp. at 10–14 *with* Pls.' Mem.Opp. at 7–11.

Assuming *arguendo* Plaintiffs meant to identify as the requisite asset or intangible the Subsidiary or the Subsidiary's unspecified "infomercials and other media items," FAS 121 does not encompass these items. "Long-lived assets" include items such as land, buildings, equipment, and furniture. *See, e.g.*, 17 C.F.R. Part 211 [SEC Staff Accounting Bulletin No. 100—Restructuring and Impairment Charges] (discussing computers, fixed assets in context of FAS 121 hypotheticals); Accounting Principles Board ("APB") Opinion No. 17 at ¶ 11 (1970); D. Edward Martin, Attorney's Handbook of Accounting, Auditing and Financial Reporting, § 5.03[3] at 5–34 (1998). "Identifiable intangibles" include items such as patents, franchises, and trademarks. *See* APB Opinion No. 17 at ¶ 1. "Goodwill" is an unidentifiable asset. *See id.* Thus, FAS 121 is inapplicable to the items gleaned from Plaintiffs' pleadings.

Plaintiffs have also failed to "estimate the future cash flows expected to result from the use of the asset and its eventual disposition" or to show that the sum of the future cash flows is less than the carrying amount. In other words, Plaintiffs have not pled with particularity facts indicating that Defendants had an obligation either to perform a review for recoverability or to recognize an impairment loss under FAS 121. Further, Plaintiffs have not alleged the basis for concluding that a review for impairment was not performed.

Significantly, Plaintiffs have also failed to allege the basis for asserting a concealed $1.498 million write-off. Instead, Plaintiffs apparently have seized figures used in subsequent financial statements to show that the information should have been disclosed earlier:

The $1,498,000 write-off was improperly deferred until after the issue of delisting was resolved ... In this regard, $800,000 was charged to earnings during the quarter ended September 30, 1998, and $698,000 was charged to earnings during the six month period ended March 31, 1999.

Am.Compl. ¶ 42. "Mere allegations that statements in one report should have been made in earlier reports do not make out a claim of securities fraud." *Stevelman v. Alias Research Inc.*, 174 F.3d 79, 84 (2nd Cir.1999). Instead, "[t]he standard is whether the need to write-down ... was 'so apparent' to [the defendant] before the announcement, that a failure to take an earlier write-down amounts to fraud." *Kriendler v. Chemical Waste Management, Inc.*, 877 F.Supp. 1140, 1154 (N.D.Ill.1995). Plaintiffs may not simply rely on the timing of a write-off. *See id.*

Plaintiffs assert that the write-off was not fully taken until March 31, 1999, well after the close of the Class Period on November 17, 1998. There is no allegation that the subsequent write-offs were based on a recognition of impairment loss, the essence of FAS 121. Seizing on figures later used in financial statements exemplifies pleading fraud by hindsight, repeatedly rejected by courts. *See Hockey*, 30 F.Supp.2d at 1213.

Plaintiffs argue the write-off was fraudulently deferred until March 31, 1999, the date Defendants presumably cured the fraud by finally recognizing the write-off. Nonetheless, Plaintiffs closed the Class Period on November 17, 1998, the date the NMS delisting letter was made public. Closing the Class Period four months before the write-off was finally taken further highlights the fraud-by-hindsight approach of Plaintiffs' pleading. The delisting letter recognized that K-tel's net tangible assets had fallen below the $4 million requirement. The letter is in no way connected or relevant to the write-off issue Plaintiffs now claim as the underlying violation of FAS 121.

## 2. FAS 5

The March 10–Q reads: "As of March 31, 1998, due to accumulated losses to date of $1,300,000 [K-tel] *has curtailed most of these media-buying operations* of [the Subsidiary] and will now focus on its existing primary businesses—music distribution and direct response marketing, and its newly launched Internet retailing business." Am.Compl. ¶ 37 (emphasis added). Plaintiffs construe the "curtailed most of these media-buying operations" language as, *inter alia*, violating FAS 5 because the Subsidiary:

> Was obligated to perform under one or more contracts which were likely to result in additional future losses of approximately $1.8 million (over and above those which had already been reported) during the twelve month period ended March 31, 1999.

Am.Compl. ¶ 45–45a.

As discussed above, allegations of GAAP violations must be particularized in detailing the transactions involved as well as the source for any figures asserted. *See Parnes*, 122 F.3d at 550 (no particularity where plaintiffs failed to identify goods and services and to specify source of figures asserted). FAS 5 provides that:

> 8. An estimated loss from a loss contingency ... shall be accrued by a charge to income if *both* of the following conditions are met:
>
> a. Information available prior to the issuance of the financial statement indicates that it is probable that an asset had been impaired or a liability had been incurred at the date of the financial statements. It is implicit in this condition that it must be probable that one or more future events will occur confirming the fact of the loss.
>
> b. The amount of loss can be reasonably estimated.

FAS 5. Defendants aptly emphasize that Plaintiffs fail to identify (1) the contract(s) in question, (2) the terms of the contracts, (3) the parties to the contract, and, most

importantly, (4) the source of the $1.8 million figure. Plaintiffs have failed to plead with sufficient particularity their claims that K-tel should have recognized losses of $1.8 million. *See Parnes,* 122 F.3d at 550; *In re Oak Tech. Sec. Litig.,* 1997 WL 448168, *8 (N.D.Cal., Aug.1, 1997) (citing *In re Wells Fargo Sec. Litig.,* 12 F.3d 922, 926–27 (9th Cir.1993)).

In connection with the alleged GAAP violations, Plaintiffs also allege conclusorily that (1) K-tel inappropriately grouped goodwill along with other assets and that (2) K-tel's Form NT 10–K, seeking an extension to file the June 10–K, failed to disclose the $1.498 million charge. For the reasons stated above, these allegations also fail for lack of specificity.

## C. Strong Inference of Scienter

The PSLRA requires particularized facts "giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). However, the PSLRA defines neither "required state of mind" nor "strong inference." Divining Congressional intent is difficult given the confusing and often contradictory legislative history. *See generally,* Ryan G. Meist, Note, *Would the Real Scienter Please Stand Up: The Effect of the Private Securities Litigation Reform Act of 1995 On Pleading Securities Fraud,* 82 Minn.L.Rev. 1103, 1106 (1998) (extensive discussion of legislative history); Michael B. Dunn, Note, *Pleading Scienter After the Private Securities Litigations Reform Act: Or a Textualist Revenge,* 84 Cornell L.Rev. 193, 198 (1998) (same). By making it more difficult for a complaint to survive a motion to dismiss, Congress sought to deter abusive law suits while protecting investors and the integrity of the market. *See* H.R.Conf.Rep. No. 104–369 (1995) (referencing "the routine filing of lawsuits against issuers of securities and others whenever there is a significant change in an issuer's stock price, without regard to any underlying culpability of the issuer" and "the abuse of the discovery process to impose costs so burdensome

that it is often economical for the victimized party to settle").

Congressional intent is further muddied by uncodified references to the Second Circuit's pleading standard for scienter. Courts concur that circumstances indicating conscious behavior by a defendant are sufficient to raise a strong inference of the defendant's fraudulent intent. At the center of the debate over the PSLRA's scienter requirement, however, is whether pleading (1) circumstances indicating reckless behavior by the defendant and/or (2) facts showing a motive for committing fraud and a clear opportunity for doing so sufficiently raises a strong inference of a defendant's fraudulent intent.

The Second Circuit standard is seen by some as encompassing all three types of factual pleadings. This position, however, has been challenged recently by some courts and commentators. *See, eg., In re Baesa Sec. Litig.,* 969 F.Supp. 238, 242 (S.D.N.Y.1997) (unclear whether Second Circuit "always accepted mere allegations of motive and opportunity as sufficient to establish scienter.") (citing Douglas M. Parker, "Fraud Under Section 10(b) of the Securities Exchange Act," N.Y.L.J., April 11, 1994, at 1). The Eighth Circuit has not yet addressed the issue.

In response to the debate over the nature of the Second Circuit's pleading standard, the First Circuit has succinctly written:

Indeed, the debate about adoption or rejection of prior Second Circuit standards strikes us as somewhat beside the point. . . . [T]his court has never adopted the Second Circuit test. Instead we have analyzed the particular facts alleged in each individual case to determine whether the allegations were sufficient to support scienter. In this, the approach of this circuit has been like that taken by the Supreme Court as to the issue of materiality in *Basic Inc. v. Levinson* [.] *While [some of our cases] could be thought of as falling into motive and opportunity patterns, this court*

*continues to prefer a more fact-specific inquiry.*

*The most salient feature of the PSLRA is that whatever the characteristic pattern of the facts alleged, those facts must now present a strong inference of scienter.*

*Greebel,* 194 F.3d at 196 (internal citations omitted) (emphasis added). The First Circuit's position is well supported by the language of the PSLRA. As stated by the Southern District of New York:

> The statute, however, while adopting the "strong inference" requirement, *makes no mention whatever of "motive and opportunity," nor singles out any other kind of particulars as presumptively sufficient.* The mere pleading of motive and opportunity does not, of itself, automatically suffice to raise a strong inference of scienter.
>
> This, of course, does not mean that particulars regarding motive and opportunity may not be relevant to pleading circumstances from which a strong inference of fraudulent scienter may be inferred. [Rather,] the pleadings must set forth sufficient particulars, of whatever kind, to raise a strong inference of the required scienter.

*Baesa,* 969 F.Supp. at 242 (emphasis added) *cited approvingly by Ceridian,* No. 97–2044 MJD/AJB, slip op. at 25 n. 1.[5] Recently, the Second Circuit, citing the language of the PSLRA, also discouraged courts and practitioners from relying on formalistic recitation of "motive and opportunity:"

> [W]e believe that Congress's failure to include language about motive and opportunity suggests we need not be wedded to these concepts in articulating the prevailing concepts.... Although litigants and lower courts need and should not rely on magic words such as "motive and opportunity," we believe that our prior case law may be helpful in provid-

ing guidance as to how the "strong inference" standard may be met.

*Novak v. Kasaks,* 216 F.3d 300, 309–10 (2nd Cir.2000).

Before the enactment of the PSLRA, "at least one court in this district required 'a strong inference of fraudulent intent....' " *In re Grand Casinos, Inc. Sec. Litig.,* 988 F.Supp. 1273, 1281 n. 10 (D.Minn.1997) (citing *In re Lifecore Biomedical, Inc., Sec. Litig.,* 159 F.R.D. 513, 516 (D.Minn. 1993)). Two courts in this District, and the First, Sixth and Eleventh Circuits have held that the PSLRA requires a fact-specific inquiry; although "motive and opportunity may be relevant to pleading circumstances from which a strong inference of scienter may be inferred, they alone will not be sufficient." *Ceridian,* No. 97–2044, slip op. at 25; *In re Rainforest Café, Inc. Sec. Litig.,* No. 98–84 RHK/JMM, slip. op. at 11 (D.Minn. Dec. 21, 1998); *Greebel v. FTP Software,* 194 F.3d 185, 186 (1st Cir. 1999) (motive sufficient if supports strong inference of scienter); *In re Comshare, Inc., Securities Litig.,* 183 F.3d 542, 551 (6th Cir.1999) ("motive and opportunity" inquiry may be relevant but not available as independent alternative pleading method); *Bryant v. Avado Brands, Inc.,* 187 F.3d 1271, 1288–85 (11th Cir.1999) (same). *But see In re Advanta Corp. Sec. Litig.,* 180 F.3d 525, 529–35 (3rd Cir.1999) ("motive and opportunity" remains a viable method for pleading scienter) (*cited approvingly* by *Green Tree,* 61 F.Supp.2d at 870 (D.Minn.)); *In re Silicon Graphics Sec. Litig.,* 183 F.3d 970, 975–79 (9th Cir. 1999) (expressing minority view that PSLRA rejected "motive and opportunity" and, possibly, recklessness as viable methods for pleading scienter).

### 1. Scienter: GAAP Violations

■ In general, allegations of GAAP violations are insufficient, standing alone, to

---

5. It is unclear whether the recently decided *Novak v. Kasaks,* 216 F.3d 300, 309–11 (2nd Cir.2000) overturns *Baesa.* Under this Court's reading, *Novak* attempts to reconcile *Baesa* with *Press v. Chemical Invest. Servs. Corp.,* 166 F.3d 529, 539 (2nd Cir.1999). Nonetheless, the reasoning of the *Baesa* court remains persuasive.

raise an inference of scienter. *See In re Ancor Comm., Inc.*, 22 F.Supp.2d 999, 1005 (D.Minn.1998); *Comshare*, 183 F.3d at 553. It is inadequate "for a plaintiff to state that because a defendant violated GAAP, the defendant knew or must have known that it was publishing materially false information." *Ivax Corp.*, 17 F.Supp.2d at 1361.

■ In the instant case, Plaintiffs may not merely aver Defendants' disclosure that "[a]s of March 31, 1998, due to accumulated losses to date of $1,300,000 [K-tel] has curtailed most of [the] media-buying operations [of the Subsidiary]," necessarily establishes that Defendants knew or must have known that it was publishing false information in violation of FAS 5 and 121. *See* Am.Compl. at ¶ 37.

Plaintiffs argue that the "substantial magnitude" of K-tel's "overstatement of assets" supports a strong inference of scienter of fraudulent intent. Plaintiffs rely, however, on cases involving defendants who restated their financial results. *See* Pls.' Mem.Opp. at 21–22, citing, *inter alia*, *Ancor*, 22 F.Supp.2d at 1002 (restated financial results); *In re Digi Int'l, Inc. Sec. Litig.*, 6 F.Supp.2d 1089, 1094 (D.Minn.1998) (restated financial results); *Chalverus v. Pegasystems, Inc.*, 59 F.Supp.2d 226, 234 (D.Mass.1999) (same); *Gross v. Medaphis Corp.*, 977 F.Supp. 1463, 1472 (N.D.Ga.1997) (same); *AUSA Life Ins. Co. v. Ernst & Young*, 991 F.Supp. 234, 239 (S.D.N.Y.1997) (restated financial results resulted in corporation's bankruptcy); *Rehm v. Eagle Finance Corp.*, 954 F.Supp. 1246, 1250 (N.D.Ill. 1997) (restated financial results); *Marksman Partners v. Chantal Pharm. Corp.*, 927 F.Supp. 1297, 1314 (C.D.Cal.1996) (defendants did not dispute allegedly overstated revenue).

Plaintiffs' factual predicate is not based on the restatement of financial results. Plaintiffs may not place the square peg of the alleged "asset overstatement" into a round "financial restatement" hole. Furthermore, Plaintiffs rely on accounting principles that are not compatible with placing the purported "substantial overstatement" into a context indicating a strong scienter of fraudulent intent. *See, eg., Green Tree*, 61 F.Supp.2d at 876–77 n. 19 ("The complex interaction between the various variables and the inexact nature of the calculations at issue here distinguishes this case from [*Grand Casinos* ]" which implicated "comparatively straightforward financial problems").

■ Plaintiffs also allege insider trading as well as the concealment of possible NMS delisting as "additional facts" supporting a strong inference of fraudulent intent. "[T]o adequately allege scienter based on insider trades, the plaintiffs must set forth facts establishing that the individual defendants' sales were suspicious because of the timing and amount of the sales." *See Chu v. Sabratek Corp.*, 100 F.Supp.2d 827 (N.D.Ill.2000). Conclusory statements that the sales were unusual or suspicious are insufficient. *See Comshare*, 183 F.3d at 553. Plaintiffs do not allege a prior history of sales by the Individual Defendants.

■ Approximately, 99.35% of the stocks sold by K-tel executives during the Class Period occurred between May 8, 1998 and June 9, 1998. On May 5, 1998, K-tel announced disappointing sales and income. On May 8, 1998, K-tel filed the March 10–Q. Weiner, Fischer and Koblick began selling stock three days *after* the announcement of K-tel's poor financial performance. Insider sales for this period continued until June 9, 1998, more than four months before the NMS risk-of-delisting letter and almost five months before K-tel allegedly touted its partnership with Playboy and Microsoft (resulting in a major upward turn in value of the stock). The pattern of insider sales occurring *after* K-tel announced disappointing figures, *before* K-tel announced its partnerships, and *before* K-tel received the delisting letter undermines any inference of fraudulent intent surrounding those sales. *See, eg., Health Mgmt. Sys., Inc. Sec. Litig.*, 1998 WL 283286, *6 (S.D.N.Y., June 1, 1998);

*Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 54 (2nd Cir.1995).

After June 9, 1998, there is one sale and one buy transaction by Defendants Fischer and Koblick respectively, within the Class Period. On November, 13, 1998, four days before the NMS delisting letter was publicly disclosed, Koblick bought 27,200 shares. *See* Cambronne Suppl.Aff., Ex. A (Koblick's Form 4). On November 17, 1998, Fischer sold 15,000 shares of K-tel. The timing and the amount of trading do not imply any inference and certainly not a strong inference of scienter.

Similarly, Plaintiffs' generalized contentions that the Individual Defendants were motivated to artificially inflate stock prices, protect their positions, seek additional capital and to increase their compensation do not satisfy the strong inference requirement.

### 2. Scienter: NASD Delisting Letter

■ Plaintiffs claim:

There can be no dispute that defendants were aware of the NASDAQ Delisting Letter. At the same time that defendants touted [K-tel's] positive financial developments, defendants intentionally and consciously chose not to disclose the delisting letter until November 17,1998.

Defs.' Mem.Opp. at 27. In the Complaint, however, Plaintiffs admit, that in the June 10–K, K-tel:

further disclosed in its consolidated balance sheet that it had shareholders' equity of $3,774,000.... *K–Tel thereby represented that it was $226,000 below the NASDAQ requirements for continued listing.*

Am.Compl. ¶ 66 (emphasis added). Thus by disclosing the figures enabling the NASD to assess whether K-tel satisfied the net tangible asset requirement, K-tel's failure to immediately publicize the letter does not create a strong inference of fraudulent intent.

Plaintiff argues that K-tel had an obligation either to disclose the letter or to abstain from trading. As discussed above,

Koblick bought over 27,000 shares on November 13, 1998 and Fischer sold 15,000 shares on November 17, 1998. The buy transaction further erodes Plaintiffs' arguments of Defendants' fraudulent intent to artificially inflate stock prices. Furthermore, the Class Period ends at approximately 11:36 a.m. on November 17, 1998. The November 17 sale has not been alleged to have occurred before 11:36 a.m. and may not be used to show a strong inference of fraudulent intent.

### D. Section 20(a) and 20A Claims

■ As discussed above, Plaintiffs have failed to state a claim under Section 10(b) of the Exchange Act. Without the requisite predicate of a 10(b) violation, Plaintiffs have failed to state a control person claim under Section 20(a). *See Deviries v. Prudential–Bache Sec., Inc.*, 805 F.2d 326, 329 (8th Cir.1986); *Parnes*, 122 F.3d at 550 n. 12 ("Because the Plaintiffs presented no actionable claim for violation of Section 11, Section 12(2), Section 10(b), Rule 10b–5, the claims for controlling person liability were also properly dismissed.").

Section 20A provides a cause of action against "[a]ny person who violates any provision of this chapter or the rules or regulations thereunder by purchasing or selling a security while in possession of material, nonpublic information...." 15 U.S.C. § 78t–1. Courts addressing the issue have concluded that:

[t]he reference to "this chapter" is to the [Exchange Act], and the language of the statute is thus quite plain that to state a claim under § 20A, a plaintiff must plead a predicate violation of the [Exchange Act] or its rules and regulations.

*Jackson Nat'l Life Ins. Co. v. Merrill Lynch Co.*, 32 F.3d 697, 703 (2nd Cir.1994). In the absence of Section 10(b) violation, Plaintiffs here have also failed to state a claim based on the Individual Defendants' alleged contemporaneous insider trading under Section 20A.

### E. Leave to Amend the Amended Complaint

The decision of whether to allow Plaintiffs to amend their complaint is within the court's discretion. *See In re Digi,* 6 F.Supp.2d at 1104. The court may deny leave to amend when to grant leave would be futile. *See id.*

Almost nine months elapsed between the filing of the Complaint and the Amended Complaint. Nonetheless, Plaintiffs were unable to plead facts with sufficient particularity to raise a strong inference of scienter. The present record fails to persuade the Court that granting leave to amend would cure the defects of the present Amended Complaint.

## IV. CONCLUSION

Based upon the foregoing, and all of the files, records and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendants' Motion to Dismiss [Doc. No. 44] is **GRANTED;** and

2. Plaintiffs' Request for Leave to Amend the Amended Complaint is **DENIED. LET JUDGMENT BE ENTERED ACCORDINGLY.**