**CARPENTERS HEALTH & WELFARE FUND, et al., Plaintiffs,**

v.

**THE COCA–COLA COMPANY, et al., Defendants.**

No. CIV.A.1:00–CV–2838–W.

United States District Court, N.D. Georgia, Atlanta Division.

March 31, 2004.

William S. Lerach, phv, Katherine Blanck Radsan, phv, Mary K. Blasy, phv, David A. Thorpe, phv, Steven W. Pepich, phv, Scott H. Saham, phv, Lerach Coughlin Stoia & Robbins, San Diego, CA, Martin D. Chitwood, Craig Gordon Harley, David Andrew Bain, Krissi T. Gore, Chitwood & Harley, Atlanta, GA, Deborah R. Gross, phv, Office of Bernard M. Gross, Philadelphia, PA, Sandra Stein, phv, Lerach Coughlin Stoia & Robbins, Philadelphia, PA, Dennis J. Herman, phv, Lerach Coughlin Stoia & Robbins, San Francisco, CA, Paul J. Geller, phv, Cauley Geller Bowman & Coates, Boca Raton, FL, Corey Daniel Holzer, Holzer Holzer & Cannon, Atlanta, for Carpenters Health & Welfare Fund of Philadelphia & Vicinity, On Behalf of Itself and All Others Similarly Situated, Gaetan Lavalla, plaintiffs.

Joel Martin Neuman, John Lewis, Jr., The Coca–Cola Company, Martin Robert Thornton, Dan Shamus McDevitt, Jeffrey S. Cashdan, Stephen B. Devereaux, King & Spalding, Atlanta, for the Coca–Cola Company, M. Douglas Ivester, Jack L. Stahl, James E. Chestnut, Douglas Daft, defendants.

## *ORDER*

HUNT, District Judge.

Before the Court in this putative securities fraud class action is Defendants' Mo-

tion to Dismiss the Amended Complaint [56]. For the reasons set forth below, this motion is GRANTED IN PART and DENIED IN PART.

## BACKGROUND

On July 25, 2001, Plaintiffs filed their consolidated class action complaint against The Coca–Cola Company ("Coke") and top Coke executives M. Douglas Ivester, Jack L. Stahl, James E. Chestnut, and Douglas Daft. Plaintiffs bring this action on behalf of all purchasers of Coke common stock between October 21, 1999 and March 6, 2000 (the "Class Period"). Plaintiffs allege that Defendants engaged in a scheme to manipulate Coke's financial results and artificially inflate the value of the company's stock during the Class Period. In connection with this scheme, Plaintiffs allege that Defendants deliberately concealed problems caused by the deteriorating value of Coke's investments in foreign assets and the diminishing demand for its products.

### I. Plaintiffs' Claims

Plaintiffs' allegations center around two theories of liability. First, Plaintiffs allege that Defendants engaged in "channel stuffing" by causing major bottlers in Japan, Russia, North America, Europe, and South Africa to accept excessive amounts of beverage concentrate and syrup during the first, second, and third quarters of 1999. Plaintiffs also allege that Coke prematurely and improperly recorded revenue on concentrate and syrup shipments. Second, Plaintiffs allege that Defendants failed to timely write down certain impaired foreign bottling and vending assets. According to Plaintiffs, these practices artificially inflated Coke's revenues, net income, and earnings per share ("EPS").

Plaintiffs rely on numerous alleged disclosures by Defendants during the Class Period to substantiate their claims. These disclosures include Coke's financial statements for the third and fourth quarters of 1999 and the year ended 1999, official statements made by Defendants directly to the public, and statements made to various reporting and investing institutions that were subsequently reported to the public. For organizational purposes, the Court has divided these statements into the following time periods: October 1999, November 1999, December 1999, and January 2000.

### A. *October 1999*

On October 21, 1999, Coke issued a press release reporting the following results for the third quarter of 1999: net operating revenues of $5.1 billion, net income of $787 million, and EPS of $0.32. The following statements in the release were attributed to Ivester:

> Some of the trends in the quarter are very encouraging ... In fact, we achieved record third quarter case sales in every one of our operating groups and in many of our key markets such as Japan, Mexico, Brazil and the United States ... We believe this sets the stage for positive momentum for our business .. As the Company looks into the fourth quarter and into the year 2000, it is encouraged with the trends in the following key areas:
>
> ● European Product Withdrawal— Over the past several months, the Company aggressively invested in marketing activities throughout Europe to ensure long-term health of its brands. The company is seeing steady improvements ...
>
> ●·For the third quarter, diluted earnings per share were $0.32. These results reflect gallon shipments being even with the prior year ...
>
> ● Worldwide gallon shipments in the third quarter of 1999 were even with the prior year quarter on a reported basis.

Amended Complaint ("AC"), ¶ 71.

In conjunction with the press release, Coke held a conference call for analysts,

money and portfolio managers, institutional investors, and large Coke shareholders to discuss the results. Plaintiffs allege that the following statements were made during the call by Ivester, Stahl, or Chestnut:

- Coke's business trends were very encouraging. Coke had turned the corner and was now positioned to return to its historic 15%—20% EPS growth rate.
- Coke was seeking steady improvement of its business in Europe and Japan—two of its largest and most important overseas markets.
- Despite weak economic conditions in several of Coke's major overseas markets and the aftermath of the European health scare, Coke had achieved flat concentrate gallonage shipments in the third quarter of 1999.
- Coke's flat concentrate gallonage shipments were due to key bottlers voluntarily reducing their beverage concentrate purchases to reduce their beverage concentrate inventories; this was positive for Coke, as bottler purchases of beverage concentrate would accelerate when consumer demand picked up in key overseas markets, which was now happening.
- Coke expected sharply increasing beverage concentrate gallonage shipments in the fourth quarter of 1999 and strong beverage concentrate gallonage increases in 2000, leading to strong 2000 EPS growth.
- Coke was now forecasting fourth quarter 1999 EPS of $0.30—$0.31, 1999 EPS of $1.29—$1.31 and 2000 EPS of $1.50—$1.60.

*Id.* at ¶ 72.

Plaintiffs also cite to subsequent reports from the Wall Street Journal, Schroder & Co., DLJ Securities, Credit Suisse First Boston, Salomon Smith Barney, Prudential Securities, and Merrill Lynch regarding the press release and conference call. *Id.*

at ¶¶ 73–79. The reports reflect the positive and encouraging statements allegedly made by Defendants about the company's performance and prospects.

### B. *November 1999*

Plaintiffs allege that in early November 1999, top executives of Coke told key analysts and members of the financial press that Coke was going to raise prices on concentrate in a bid to improve profitability. Plaintiffs allege that this news, coupled with other false and misleading assurances by Ivester, Stahl or Chestnut, led to positive forecasts reported in the following: November 4, 1999 Wall Street Journal article; November 2, 1999 Brown Brothers Harriman report; November 22, 1999 Merrill Lynch report; November 23, 1999 Lehman Brothers report; November 23, 1999 Credit Suisse First Boston report; and November 30, 1999 DLJ Securities Report. *Id.* at ¶¶ 82–87.

### C. *December 1999*

On December 6, 1999, Defendants announced Ivester's retirement as Chairman and CEO of Coke. Plaintiffs allege that Defendants orchestrated his "retirement" when in fact he was fired due to his and Coke's poor performance. Plaintiffs allege that despite Defendants' attempt to mask the firing of Ivester and underlying financial problems, Coke's stock still fell from $68 3/16 on December 6, 1999 to $58 3/4 on December 7, 1999. In order to refute apparent concerns that there were serious problems at Coke, Plaintiffs allege that Defendants falsely assured analysts that Ivester's voluntary retirement did not indicate that there were any serious undisclosed problems with the company, and Coke did not anticipate any significant change in the way it did business.

Plaintiffs refer to subsequent reports issued by Lehman Brothers, Credit Suisse First Boston, J.P. Morgan, Prudential Securities, Paine Webber, Warburg Dillon

Read, and the Wall Street Journal. Plaintiffs contend that these reports were based on discussions with Daft, Stahl or Chestnut, who made assurances that the management change had nothing to do with Coke's performance or any anticipated change in company strategy. Defendants allegedly assured investors that Coke's business outlook remained bullish. *Id.* at ¶¶ 93–100.

### D. *January 2000*

Plaintiffs allege that during mid-January 2000, rumors circulated that Coke might take asset write-downs and announce layoffs when it reported its results for the fourth quarter of 1999. However, based on their conversations with Daft, Stahl, and Chestnut, Plaintiffs contend that the analysts continued to forecast strong volume gains in the fourth quarter. Plaintiffs point to a January 17, 2000 Wall Street Journal article quoting an unidentified Coke spokesperson who, when asked if Coke would record a charge based on the impairment of certain Russian assets, answered: "The [Company's] management team is examining every aspect of operations. At this point no decisions have been made and since we don't comment on rumor or speculation it would be inappropriate to comment further." *Id.* at ¶ 103.

Nine days later, on January 26, 2000, Coke announced that although it had achieved another record year of worldwide unit case volume, it would report a fourth quarter per share loss of $0.02 (including a $0.31 per share loss attributable to Coke's decision to write down certain long-lived assets in Russia, the Baltics, Japan, and other countries) and full year diluted earnings of $0.98. Coke also announced that it was engaged in a comprehensive review of its bottling operations in India, which it hoped to complete during the first quarter of 2000. Additionally, Coke stated it had been working with bottlers to determine "optimal" bottler inventory levels and,

based upon that process, some bottlers had indicated that they would reduce inventory levels in 2000. Coke also announced that it would engage in a restructuring and eliminate approximately 6,000 positions.

## II. Procedural History

On September 24, 2001, Defendants filed a motion to dismiss for failure to state a claim on the grounds that the complaint failed to satisfy Federal Rule of Civil Procedure 9(b) or the heightened pleading requirements of the Private Securities Litigation Reform Act of 1995 ("PSLRA"). The Court granted the motion in part, dismissing Plaintiffs' claims based on channel stuffing and statements made by analysts. Specifically, the Court found that Plaintiffs' channel stuffing allegations failed to meet the heightened pleading standard because (1) Plaintiffs failed to identify at least one particular channel stuffing transaction; and (2) Plaintiffs did not adequately plead the basis of their information and belief allegations. The Court found that Plaintiffs' allegations regarding analyst statements were insufficiently particular because they did not identify the specific statements made by Defendants, and, in some cases, did not identify which Defendant made the statement or when the statement was made. In dismissing these claims, the Court granted Plaintiffs leave to amend the complaint.

Defendants moved the Court for reconsideration, arguing that the asset impairment allegations should have been dismissed because they were also based on factually unsupported information and belief allegations. The Court declined to reconsider the order, but directed Plaintiffs to set forth the underlying facts for all information and belief allegations when they amended the complaint. Plaintiffs filed their amended complaint on June 2,

2003. Presently before the Court is Defendants' motion to dismiss the amended complaint in its entirety.

## DISCUSSION

### I. Rule 12(b)(6) Standard

A district court may dismiss a complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations. *Powell v. United States*, 945 F.2d 374, 375 (11th Cir.1991). In evaluating a motion to dismiss for failure to state a claim, a court must accept as true all allegations contained in the complaint and must view the complaint in the light most favorable to the plaintiff. *Peterson v. Atlanta Housing Auth.*, 998 F.2d 904, 912 (11th Cir.1993). While the Court must weigh every inference in plaintiff's favor, however, "conclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal." *Oxford Asset Mgmt. v. Jaharis*, 297 F.3d 1182, 1188 (11th Cir.2002). The "threshold of sufficiency that a complaint must meet to survive a motion to dismiss for failure to state a claim is exceedingly low." *Quality Foods de Centro America, S.A. v. Latin American Agribusiness Dev. Corp.*, 711 F.2d 989, 995 (11th Cir.1983). Thus, a court can dismiss a claim under Federal Rule of Civil Procedure 12(b)(6) only when a plaintiff "can prove no set of facts which would entitle him to relief." *Martinez v. American Airlines, Inc.*, 74 F.3d 247, 248 (11th Cir.1996).

### II. Federal Securities Laws

■ Plaintiffs allege that Defendants violated Section 10(b) of the Securities Exchange Act of 1934 which makes it "unlawful for any person, directly or indirectly ... [t]o use or employ, in connection with the purchase of any security ... any ma-nipulative or deceptive device or contrivance in contravention of such rules and regulations as the Securities and Exchange Commission ['SEC'] may prescribe." 15 U.S.C. § 78j(b). The SEC has promulgated Rule 10b–5, which prohibits the "employ[ment of] any device, scheme, or artifice to defraud" and the "mak[ing of] any untrue statement of a material fact or [the omission of] a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b–5. To state a securities fraud claim under Section 10(b) and Rule 10b–5, Plaintiffs must plead (1) that Defendants made a misrepresentation or omission, (2) of material fact, (3) with scienter, (4) in connection with the purchase or sale of securities, (5) upon which Plaintiffs reasonably relied, (6) that proximately caused Plaintiffs' injury. *See Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1281 (11th Cir.1999); *Robbins v. Koger Properties, Inc.*, 116 F.3d 1441, 1447 (11th Cir.1997).

### III. Special Pleading Standards

■ Because this is a securities fraud case, Plaintiffs' allegations must comply with the special pleading requirements set forth in Federal Rule of Civil Procedure 9(b) and the PSLRA. Rule 9(b), applicable to all averments of fraud or mistake, requires that the "circumstances constituting fraud or mistake shall be stated with particularity," but permits "[m]alice, intent, knowledge, and other condition of mind of a person [to] be averred generally." Fed.R.Civ.P. 9(b). A complaint satisfies Rule 9(b) if it sets forth precisely what statements or omissions were made, in what documents or oral representations they were made, who made the statements, the time and place the statements were made, the content of the statements, the manner in which they misled the plaintiff, and what benefit the defendant gained

as a consequence of the fraud. *See Brooks v. Blue Cross and Blue Shield of Fl.*, 116 F.3d 1364, 1371 (11th Cir.1997). In short, a complaint must state the "who, what, when, where, and how: the first paragraph of any newspaper story." *Gross v. Medaphis Corp.*, 977 F.Supp. 1463, 1470 (N.D.Ga.1997) (quoting *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir.1990)).

The PSLRA further heightens the pleading standard. Under the PSLRA, the "complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1). "Notwithstanding the use of the word 'all,' paragraph (b)(1) does not require that plaintiffs plead with particularity every single fact upon which their beliefs concerning false or misleading statements are based. Rather, plaintiffs need only plead with particularity sufficient facts to support those beliefs." *In re Theragenics Corp. Sec. Litig.*, 105 F.Supp.2d 1342, 1355 (N.D.Ga.2000) (quoting *Novak v. Kasaks*, 216 F.3d 300, 313 (2d Cir.2000), *cert. denied*, 531 U.S. 1012, 121 S.Ct. 567, 148 L.Ed.2d 486 (2000)). The standard for information and belief pleading has been summarized as follows:

> In practice, this pleading requirement may be easily satisfied by references to internal memoranda or other documents, press releases, news articles, and government-mandated filings. A plaintiff at this stage of the litigation, however, need not provide the names of either corporate whistle-blowers, customers of the defendant, or even outside consultants who provided factual support for the allegations, provided that there are other facts that provide an adequate basis for believing that the defendants' statements were false. If there are no other sources of information, it is enough that the plaintiff cite human sources without providing their names, provided that enough information is given to assure the Court that the plaintiff is not seeking to use discovery merely as a fishing expedition in the hope that something will turn up.

*Id.*

## IV. Defendants' Motion to Dismiss

Defendants assert that the amended complaint fails to satisfy the heightened pleading standard and is therefore subject to dismissal for the following reasons: (1) Plaintiffs failed to amend their insufficiently particular allegations regarding statements made to analysts; (2) other statements identified by Plaintiffs as false and misleading are inactionable; and (3) Plaintiffs have failed to adequately plead the reasons why certain financial statements and related disclosures were false.[1]

### A. Analyst Statements (AC ¶¶ 72–80, 82–87, 92–95, 97–100, 102)

The Court previously dismissed claims based on the alleged misrepresentations made by Defendants to securities analysts and reporters because Plaintiffs did not identify any specific statements made by Defendants, and, in some cases, did not identify who made the statement or when the statement was made. Defendants contend that these allegations must be dismissed because Plaintiffs did not amend

---

1. Defendants also argue that the amended complaint violates the policy against shotgun pleadings. While lengthy and unnecessarily repetitive, the Court cannot say that the amended complaint is so disorganized or indecipherable that it warrants dismissal on this ground.

them in accordance with the Court's order. Plaintiffs acknowledge that they have been unable to further particularize these allegations. Therefore, the motion to dismiss claims based on these alleged misrepresentations is GRANTED.

## B. Other Statements (AC ¶¶ 71, 91, 96, 103)

Defendants contend that statements made by Ivester in the third quarter earnings release about Coke's economic performance and statements made by a spokesperson about Coke's prospects following Ivester's resignation are protected by the PLSRA's safe harbor provision, 15 U.S.C. § 78u-5(i)(1). The Court previously rejected this argument, finding that the majority of statements relied upon by Plaintiffs fall outside the safe harbor's protections, and, in any event, it would be imprudent to grant Defendants' motion based on the safe harbor provision at this stage of the case. Accordingly, the motion to dismiss on safe harbor grounds is DENIED.

Defendants also assert that Plaintiffs have not pled specific facts to support their allegations that the following statements are false or misleading: (1) Ivester's statement announcing his voluntary retirement; and (2) a spokesperson's statement that the management team was "examining every aspect of operations," but had not made any decisions about whether it would take charges in the fourth quarter. The Court has been unable to find any sources to support Plaintiffs' allegations, pled on information and belief, that Ivester was forced to resign, or that Coke's officers and board members had already reached a final decision about the charges. Accordingly, Defendants' motion to dismiss with respect to these statements is GRANTED.

## C. Financial Statements (AC ¶¶ 122–197)

Plaintiffs allege that Coke's financial statements and related disclosures for at least the third quarter, fourth quarter, and the year ended 1999 were false because Defendants (1) failed to disclose that Coke was causing bottlers to accept hundreds of millions of dollars of excessive concentrate and improperly accounting for beverage concentrate sales; and (2) failed to timely disclose that certain bottling and vending assets were impaired. Defendants again move for the dismissal of these allegations.

### 1. Channel Stuffing Allegations (AC ¶¶ 122(a)-(b), 124–176)

The Court previously dismissed Plaintiffs' channel stuffing allegations as insufficiently particular because Plaintiffs made only general allegations about Defendants' dealings with its bottlers. In order to satisfy the heightened pleading requirement, the Court explained that Plaintiffs must include allegations of *at least one* specific channel stuffing transaction, including the name of the bottler, the amount of revenue improperly recognized, and when the transaction occurred (noting that identification of the quarter would be sufficient if a specific bottler is named and a dollar amount given). Additionally, the Court required Plaintiffs to provide support for their information and belief allegations.

█ In their amended complaint, Plaintiffs allege that in 1999, Defendants shipped $600 million worth of excessive concentrate to its bottlers as follows: $233 million to Japanese bottlers; $168 million to European bottlers; $184 million to North American bottlers; and $63 million to South African bottlers. AC ¶ 128. Plaintiffs allege that this "concentrate loading was 'extraordinary,' as Coke was loading 'extreme' amounts of syrup at the

end of 1999 while the Company's overall business suffered as a result of the [health] scare in Belgium and an employment discrimination lawsuit." *Id.* at ¶ 131. Plaintiffs include specific allegations about transactions involving the Martin–Brower Company, Herb Coca–Cola, and fifteen Japanese bottlers. While the allegations regarding Martin–Brower and Herb Coca–Cola are not as detailed as the allegations set forth below regarding Japanese bottlers, Plaintiffs have satisfied the minimal pleading requirements previously outlined by the Court.[2]

### Specific Transactions Involving Japanese Bottlers

Based on information obtained from three former senior Coke executives with extensive experience in Japan, including two former Coke vice presidents, Plaintiffs allege that Coke loaded excessive amounts of concentrate on Japanese bottlers throughout the Class Period, usually in the last weeks of a financial reporting period. AC ¶ 148. More specifically, Plaintiffs allege that in December 1999, Daft and Chestnut directed Steve Jones, Deputy Division President of Coca–Cola Japan Co. Ltd. ("CCJC"), and another CCJC executive to general additional revenue through concentrate loading. Jones and the other executive then instructed Roi Suzuki, Executive Vice President of CCJC, and Masahiko Uotani, Senior Vice President of CCJC, to carry out a plan to collect more

than $200 million in incremental revenue in exchange for the payment of unusual incentives.[3] *Id.* at ¶ 151. According to Plaintiffs, during December 1999, an additional 140,044 units of concentrate were loaded into 15 different bottlers in Japan, resulting in additional revenue of more than $200 million. *Id.* at ¶ 159.

As examples of specific channel stuffing transactions, Plaintiffs allege that Uotani contacted Keiji Takanashi, President of Tokyo Coca–Cola Bottling Company, on or about December 10, 1999. Uotani agreed to pay Takanashi ¥60 million in incentives, and Takanashi agreed to pay an additional ¥2.8 billion (approximately $25 million) for 16,453 additional units of concentrate. Plaintiffs allege that Takanashi would normally have purchased only 9,804 units. *Id.* at ¶ 157. Similarly, Plaintiffs allege that Suzuki contacted Mr. Kubo, President of Coca–Cola West Japan ("CCWJ") on or about December 12, 1999. Suzuki convinced Kubo to accept ¥123.3 million as incentive to purchase 24,087 additional units of concentrate, representing ¥4.11 billion (approximately $40 million) in incremental revenue for Coke. Plaintiffs allege that CCWJ would normally have purchased only 15,368 units of concentrate in December. *Id.* at ¶ 158.

### Improper Conduct

Defendants argue that even if sufficiently particular, these allegations should be dismissed because Defendants did nothing

---

**2.** Based on information obtained from a former Coke director of quality assurance, Plaintiffs allege that Coke loaded $5.4 million of excess syrup on Martin–Brower, a subsidiary of Reyes Holding LLC and McDonald's, in late 1999. Although McDonald's was not required to pay for the syrup until and unless it was used, Plaintiffs allege that Coke improperly booked the transactions as revenue and created an account receivable. AC ¶ 132. Based on information obtained from a former internal control auditor at Herb Coca–Cola, Plaintiffs allege that in September/October

1999, Herb Coca–Cola's Indianapolis facility received between 286,000 and 344,000 gallons of excess concentrate and 294,000 gallons of excess syrup. Plaintiffs did not allege how much revenue was improperly recognized from this transaction. *Id.* at ¶ 133.

**3.** Plaintiffs allege that in December 1999, Coke allotted approximately ¥720 million to be given to Japanese bottlers, alleging that this "cash pay-off was essentially leveraged into more than ¥20 billion in additional, yet fictitious, revenue for the month." AC ¶ 154.

wrong. While there is nothing inherently improper about pressing for sales to be made earlier than in the normal course, Plaintiffs may state a claim for securities fraud by "alleging that [Coke] materially misrepresented its financial condition by failing to disclose sales practices that encouraged customers to purchase substantial advance inventories of product because such practices could reduce the company's future revenues." *In re Scientific–Atlanta, Inc. Sec. Litig.,* 239 F.Supp.2d 1351, 1362–63 (N.D.Ga.2002). "Moreover. [Coke] was obligated to reveal channel stuffing once sales, earnings, and growth projections were disclosed because such information could be important to a reasonable investor." *Id.* at 1363. According to Plaintiffs, "Coke knew the bottlers were already overstocked, and it was defendants' intent to artificially inflate income and manage earnings that caused Coke to push this excess product onto bottlers ... Thus, Coke's representations that increasing consumer demand caused revenue growth during the Class Period were both fictitious and misleading." *Id.* at ¶¶ 162–163.

### Related Channel Stuffing Allegations

■ Plaintiffs allege that Defendants violated Generally Accepted Accounting Principles ("GAAP") and SEC rules by improperly recording revenue on transactions when concentrate or syrup had not yet been ordered or shipped. *See* AC ¶¶ 173–175. Plaintiffs allege generally that if Coke's Deputy Division President for Japan could not convince a distributor to accept excess product, his staff was directed to record a sale of concentrate without actually shipping it. However, Plaintiffs have not tied this "ship-in-place" scheme to any specific transactions, nor have they alleged how much revenue was

improperly recognized in this manner or at what point during the Class Period these events took place. Consequently, these allegations are insufficiently particular and subject to dismissal. *See, e.g., In re Peerless Systems, Corp. Sec. Litig.,* 182 F.Supp.2d 982, 991–92 (S.D.Cal.2002) (dismissing claim for improper revenue recognition where plaintiffs failed to identify any specific transaction or provide any details regarding those transactions).[4]

■ Plaintiffs also allege that Defendants developed a plan to disguise their excessive concentrate shipments in late 1999 as a necessary Y2K preparation. *See* AC ¶¶ 140–147. These allegations are also insufficiently particular in that Plaintiffs have not tied this scheme to any specific bottlers or transactions, and they have not alleged how much revenue was improperly generated by the scheme. Finally, to the extent that Plaintiffs assert that Defendants are liable for channel stuffing conducted by their bottlers, Plaintiffs' allegations are insufficiently particular because, *inter alia,* they do not allege at least one specific transaction where a bottler loaded excessive cases of product on a retail customer. *See id.* at ¶¶ 164–172.

### Conclusion

The Court previously recognized that it would be unrealistic to require Plaintiffs to detail every particular channel stuffing transaction without the benefit of discovery. In light of the extensive investigation conducted by Plaintiffs and the amount of detail provided thus far, the Court concludes that Plaintiffs are entitled to pursue discovery to further develop their channel stuffing claim. Accordingly, with the exception of the related allegations outlined

---

4. Plaintiffs' allegations that Defendants came up with "special-payment terms" and "return-for-credit terms" for bottlers who received excessive concentrate suffer from the same defects. *See* AC ¶¶ 135, 142, 145.

above, the motion to dismiss this claim is DENIED.

### 2. Asset Impairment Allegations (AC ¶¶ 122(c), 176–197)

In the fourth quarter of 1999, Coke recorded a charge of approximately $543 million to reflect the impairment of certain assets in Russia and the Caribbean. In the first quarter of 2000, Coke recorded a $405 million charge to reflect the write-down in carrying value of the company's bottling operations in India. Plaintiffs allege that based on the negative economic environment, an impairment review of Coke's assets in Russia and India during the third quarter of 1999 and the fourth quarter of 1999, respectively, would have required Coke to record these charges a quarter earlier. AC ¶¶ 180–187.[5] Defendants contend that the asset impairment allegations are insufficiently particular because Plaintiffs failed to allege any facts that call into question the impairment review conducted by Coke pursuant to SFAS 121.[6] Plaintiffs argue that they are not required to allege details of SFAS 121

calculations because other allegations establish Defendants' failure to take timely write-downs, and there is no evidence that Defendants performed an impairment review during the Class Period.

■ The Court previously considered and rejected similar arguments advanced by Defendants, finding that Plaintiffs had pled their asset impairment claims with sufficient particularity. The Court noted that Plaintiffs' allegations made clear that the need to write-down was so apparent to Defendants that a failure to take earlier write-downs amounted to fraud. See K–tel Int'l, Inc. Sec. Litig., 107 F.Supp.2d 994, 1001 (D.Minn.2000). In other words, Plaintiffs have not merely "seized figures used in subsequent financial statements to show that the information should have been disclosed earlier." Id. at 1000. Cf. In re Serologicals Sec. Litig., No. 1:00–CV–1025–CAP (N.D.Ga. Feb. 20, 2003) (unpublished opinion) (dismissing similar claim where it was undisputed that the company had performed an earlier impairment review, but the plaintiffs made no

---

**5.** Plaintiffs allege that an impairment analysis would have shown that Coke's Russian assets were impaired by September 30, 1999, based on the following factors: the worsening of Russia's economic crisis in 1998; charges recorded by competitors Pepsi and Cadbury Schweppes in the fourth quarter of 1998; a 60 percent decrease in Coke's sales in Russia between August 1998 and September 30, 1999, coupled with a four-fold increase in the cost of production; Coke's abandonment of two large bottling facilities in Russia prior to the end of the third quarter of 1999; a 50 percent decline in the value of Russian bottling assets by October 1998; and lay-offs of Coke's staff in Russia. AC ¶¶ 180–183. Plaintiffs identify the following factors existing as of December 31, 1999 with respect to India: continued poor performance in the Indian territories; a shake-up in Coca–Cola India management; idle bottling plants; and lay-offs of Coke's staff in India. Id. at ¶ 186.

**6.** Coke's standard procedure regarding the writing-down of assets is governed by the

Statement of Financial Accounting Standards ("SFAS") No. 121. With regard to assets held for use, SFAS 121 requires that companies review assets for potential impairment whenever events or changes in economic circumstances indicate the asset's value may not be recoverable. Once a company has reason to know that assets are potentially impaired, it must "estimate the future cash flows expected to result from the use of the asset and its eventual disposition." If the sum of the expected future cash flows is less than the asset's carrying amount, then the company must recognize an impairment loss and report that loss in the reporting period when the determination is made. If not, the company cannot recognize an impairment loss. With regard to assets held for sale, once the company commits to a plan to dispose of the assets, the company must report the value of those assets at the lower of (1) the carrying amount, or (2) fair value less cost to sell.

allegations calling into question the propriety of that review).

Furthermore, contrary to Defendants' assertions, the Court concludes that Plaintiffs have pled sufficient facts to support their information and belief allegations. Plaintiffs' sources include not only former high level and "well-placed" Coke employees, but also articles from such publications as the Wall Street Journal Europe, Economic Times of India, India Business Insight, AFX News, Interfax Russian News, Baltic News Service, Financial Times, and the Boston Globe. Accordingly, the motion to dismiss Plaintiffs' asset impairment allegations is DENIED.

## V. Leave to Amend

█ Plaintiffs summarily request leave to amend their complaint should it be found insufficient in any respect. Under Federal Rule of Civil Procedure 15(a), "leave shall be freely given when justice so requires." In deciding whether to grant leave, the Court has considered factors such as undue delay, bad faith, futility of amendment, undue prejudice to Defendants, and Plaintiffs' repeated failure to cure deficiencies. *See Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). Because the Court has already granted Plaintiffs leave to amend and it is not clear how Plaintiffs would cure the remaining deficiencies, their request is DENIED.

### CONCLUSION

For the reasons set forth above, Defendants' Motion to Dismiss the Amended Complaint [56] is GRANTED IN PART and DENIED IN PART. Plaintiffs' request for leave to amend the amended complaint is DENIED.